**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Marilyn Kelly       Michael F. Cavanagh
                    Maura D. Corrigan
                    Robert P. Young, Jr.
                    Stephen J. Markman
                    Diane M. Hathaway
                    Alton Thomas Davis

FILED SEPTEMBER 7, 2010

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                                    No. 137755

GEORGE WALTER TENNYSON,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except DAVIS, J.)

MARKMAN, J.

We granted leave to appeal to consider whether evidence that a child was present in a home in which defendant was in possession of drugs and firearms is, by itself, legally sufficient to support defendant's conviction under MCL 750.145 for doing an act that "tended to cause a minor child to become neglected or delinquent so as to tend to come under the jurisdiction of" the family division of the circuit court. We hold on the facts of this case-- where there is no evidence that the child was aware of such drugs or firearms-- that there is insufficient evidence to support defendant's conviction under this statute. To

decide otherwise would render a conviction under MCL 750.145 an increasingly routine appendage to a broad array of other criminal charges in instances in which a child is merely present in a home where evidence of a crime has been uncovered. Moreover, to decide otherwise would have considerable implications for the process by which parental rights are terminated in this state, for, as the facts of this case demonstrate, a conviction under MCL 750.145 would almost certainly constitute a trigger at least for the *initiation* of the termination process by the Department of Human Services. Because this result has never before been reached by courts of this state, and because we believe that such result was never intended by the Legislature, we reverse in part the judgment of the Court of Appeals, vacate defendant's conviction under MCL 750.145, and remand to the trial court for proceedings consistent with this opinion. Defendant's drug and firearms convictions, which the Court of Appeals has affirmed, are not affected by this decision.

## I. FACTS AND HISTORY

On August 16, 2006, Detroit police executed a search warrant at defendant's home. They found defendant sitting on a bed in one of the home's two bedrooms. When one of the officers looked under the bed, he found a baggie of what he believed, based on his experience and training with narcotics, to be heroin on a plate with a razor blade and a coffee spoon. A second officer testified similarly, estimating that the amount recovered was approximately three grams, with a street value of about $700. The police also found two loaded firearms in a dresser drawer in the same bedroom. The bedroom contained both men's and women's clothing, while the other bedroom contained only children's clothing.

2

At the time of the raid, there was a woman seated on the front porch and a 10-year-old boy on a couch in the living room. A third officer, Kathy Singleton, testified that she observed that the child, who was defendant's stepson, was scared and crying when the officers entered. The woman, who was defendant's wife and the child's mother, was handcuffed and given a citation.

Defendant was charged with possession of less than 25 grams of heroin, MCL 333.7403(2)(a)(*v*), being a felon in possession of a firearm, MCL 750.224f, possession of a firearm during the commission of a felony, MCL 750.227b, and contributing to the neglect or delinquency of a minor, MCL 750.145. The information for the latter violation stated that defendant had contributed to the neglect or delinquency of the child by "exposing him to the use and sale of narcotics."

With respect to the latter charge, the prosecutor argued at trial that the child "being in that house is being subject to neglect and/or delinquency." In its instructions, the trial court stated:

> To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt: that the defendant acted or by any word, encouraged, contributed toward, caused or tended to cause any minor child under the age of 17 years to become neglected or delinquent.

The jury convicted defendant of all charges. At sentencing, the trial court imposed a suspended sentence of 45 days in jail for the misdemeanor of contributing to the delinquency of a minor. The court also told defendant that it would contact the Department of Human Services (DHS) to request that a petition be filed to terminate his

3

parental rights, and that same day wrote to DHS requesting that it investigate possible child neglect and abuse by defendant.

The Court of Appeals affirmed defendant's convictions and sentences. *People v Tennyson*, unpublished opinion per curiam of the Court of Appeals, issued October 16, 2008 (Docket No. 278826). Regarding defendant's conviction under MCL 750.145, the Court noted that the statute "was aimed at preventing conduct 'which would *tend to cause* delinquency and neglect as well as that conduct which obviously *has caused* delinquency and neglect.'" *Id*. at 4, quoting *People v Owens*, 13 Mich App 469, 479; 164 NW2d 712 (1968) (emphasis in original).

> Here, defendant's actions, at the very least, placed [the child] directly in a home where illegal activity was occurring. It would be reasonable for the jury to infer that defendant knew [the child] was living in a house where heroin and loaded firearms were unlawfully kept. When considering the evidence in the light most favorable to the prosecutor, there was sufficient evidence for the jury to infer that defendant's illegal activities could have subjected his son to the jurisdiction of the courts. Therefore, there was sufficient evidence to convict defendant of contributing to the neglect or delinquency of a minor. [*Tennyson*, unpub op at 4.]

This Court directed that oral argument be heard on the application for leave to appeal and specified that the parties must address whether the evidence was legally sufficient to sustain defendant's conviction under MCL 750.145, *People v Tennyson*, 483 Mich 963 (2009), and argument was heard on November 4, 2009.

## II. STANDARD OF REVIEW

This case presents an issue of statutory interpretation, which we review de novo. *People v Babcock*, 469 Mich 247, 253; 666 NW2d 231 (2003). In determining whether

4

the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor. "[T]he question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002).

### III. ANALYSIS

### A. MCL 750.145

We are called upon to construe MCL 750.145, which provides:

> Any person who shall by any act, or by any word, encourage, contribute toward, cause or tend to cause any minor child under the age of 17 years to become neglected or delinquent so as to come or tend to come under the jurisdiction of the juvenile division of the probate court, as defined in [MCL 712A.2], whether or not such child shall in fact be adjudicated a ward of the probate court, shall be guilty of a misdemeanor.

This statute requires that the prosecutor prove beyond a reasonable doubt that defendant (1) by any act or word (2) "tend[ed] to cause" any minor[1] (3) to "become neglected or delinquent" (4) so as to "tend to come" under what was then probate court jurisdiction, which has since been transferred to the family division of circuit court, or "family court."[2]

---

[1] Alternatively, this element can be satisfied with proof that defendant "encourage[d], contribute[d] toward, [or] cause[d]" a minor to become neglected or delinquent. Like the prosecutor, we focus our analysis on the "tend[ed] to cause" alternative because it requires the lowest threshold of proof.

[2] Alternatively, this element can be satisfied with proof that the minor child did, in fact, "come . . . under the jurisdiction of the probate court." The instant analysis focuses on the "tend to come" alternative again because it requires the lowest threshold of proof.

The statute also makes clear that "neglect" and "delinquency" are specifically defined by MCL 712A.2, and that an adjudication that the child is, in fact, a ward of the court is not a prerequisite to a conviction. These conclusions are compelled by the statute and were articulated by the Court of Appeals over 40 years ago in *People v Owens*, 13 Mich App at 475-476, 479.[3]

Although it is clear that a prior adjudication of neglect or delinquency is not required for a conviction under MCL 750.145, the open question, which goes to the heart of this appeal, is what *level of certainty* is required in order for the fact-finder to determine that a defendant "tend[ed] to cause" a minor to become delinquent or neglected so as to "tend to come" under family court jurisdiction. The focal point in this inquiry is, of course, the statute's twice-repeated use of the word "tend." When reviewing a statute, "'a word or phrase is given meaning by its context or setting.'" *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002) (citation omitted). This "tend" language provides an alternative ground for satisfying two of the statute's critical elements-- a person must "cause or *tend* to cause" a minor to "come or *tend* to come" under family court jurisdiction. The verbs "cause" and "come," which immediately precede "tend" in each instance, require it to be shown that a person did *in fact* do something that caused a minor to fall within family court jurisdiction. However, "tend to

---

[3] Contrary to the assertions of the dissents, the fact that the violation of this statute constitutes a misdemeanor has no obvious bearing on this Court's application of the "sufficiency of the evidence" standard, which is the same for a misdemeanor as for a felony. Both require evidence that would allow a reasonable fact-finder to find defendant guilty beyond a reasonable doubt.

cause" and "tend to come" require a lesser showing; each formulation lowers the threshold of proof required by "cause" and "come," respectively, and each does not require the actual exercise of family court jurisdiction.

When reviewing a statute, all undefined "words and phrases shall be construed and understood according to the common and approved usage of the language[.]" MCL 8.3a. To determine the ordinary meaning of undefined words in the statute, a court may consult a dictionary. *People v Stone*, 463 Mich 558, 563; 621 NW2d 702 (2001). "Tend" is a non-technical word that is not defined by the statute, which according to the dictionary's first entry for the word means "to be disposed or inclined . . . to do something."[4] *Random House Webster's College Dictionary* (1997). As this definition indicates, "tend" is a forward-looking word that assesses possibilities and does not pertain to the absolute certainty of things that are past and completed.

However, the fact that "tend" pertains to matters that cannot be assessed with absolute certainty, unlike matters that have already occurred, does not mean that the determination that a person is "disposed or inclined" toward something can be made arbitrarily. Instead, logic suggests that "tend" is commonly understood to express *some* level or gradation of certainty, for if a person is "disposed or inclined" to do one thing, he is obviously not "disposed or inclined" to do its opposite. Stated another way, although "tend" conveys possibilities along a continuum, logically, a person can only "tend"

---

[4] This definition is similar to that relied upon by the prosecutor, which defines "tend" as meaning "to be apt or inclined." *Oxford Dictionary & Thesaurus, American Edition* (1996).

toward one end of that continuum at any given time. The term thus implies a level of certainty greater than 50 percent, to wit, that it is possible to conclude from the available information and circumstances that something is "more likely than not" to occur.[5]

However, "tend" is not always used to convey gradations of certainty. The last dictionary entry for "tend" defines it as "to lead or be directed in a particular direction." *Random House Webster's College Dictionary* (1997). While this definition is also consistent with the word's forward-looking quality, in this purely directional sense, it does not compel the conclusion that a person is closer to one end of a continuum than the other. Instead, in this sense, "tend" can mean that a person has, perhaps for just an instant, been turned "toward" a "particular direction." Thus, a determination that a person "tends" toward something in this sense could be made where there is only a 5 percent or 1 percent or 0.3 percent chance that a particular result will occur. That is, even though a person remains far closer to one end of the "good behavior-bad behavior" spectrum, if he is turned "toward" the other end even momentarily, it can be said by the purely directional understanding of the term that such person "tends" toward that direction. Because this understanding does not necessitate a comparison of possible outcomes or alternatives, a determination that a person "tends" toward something in this

---

[5] This common understanding of "tend" is taken for granted in everyday speech. Thus, the statement "I tend to be an early riser" conveys that I tend *not* to be a late riser; and the statement "My son tends to be a well-behaved child" conveys that he tends *not* to be a poorly behaved child. From these statements, it can be said that, more likely than not, I will get up early and my son will behave well.

directional sense can be based on what is merely a snapshot of information from a single or discrete moment in time.

For several reasons, we believe that the purely directional meaning of "tend" is not what was intended by the drafters of MCL 750.145. First, the dictionary entry for "tend" emphasizes that when used in this sense, "tend" is often followed by "toward." That is, "tend" *tends* to be followed by "toward." However, the latter "companion" word is absent from MCL 750.145.

Second, the directional sense of "tend" does not accurately reflect the word's specific placement in this statute. The statute pairs "tend to cause" and "tend to come" with "cause" and "come," respectively. The difference between each of these pairings is essentially one of degree, not kind. However, an interpretation of "tend" that is based merely on direction bears no conceptual connection to actually "causing" neglect or delinquency or actually "com[ing] under" family court jurisdiction, the alternative violations with which the "tend" violations are paired. Thus, instead of establishing pairings of violations in which apples are compared with apples-- in which the magnitude of the *certainty* or *likelihood* of the harm is what distinguishes the violations-- the directional understanding establishes pairings of violations in which apples are compared with oranges-- in which there is no coherent relationship within each pairing.

Third, construing "tend" in its directional sense in this statute would result in a highly unreasonable and unworkable, if not potentially absurd, interpretation. If all that is required by "tend" is a determination that a child had been turned in the "direction" of neglect or delinquency-- "toward" the "bad behavior" rather than "toward" the "good

9

behavior" end of the spectrum, and without regard to whether the child had been moved *closer* to the "bad behavior" outcome than to the "good behavior" outcome, what other than prosecutorial discretion would prevent a parent from being charged with "contributing to the neglect and delinquency of their children" whenever they tell their children a lie, exceed the speed limit while children are in the car, nick another car in a parking lot where children are present and fail to take responsibility, use coarse language in front of their children, or engage in any other such behavior into which imperfect parents sometimes lapse? Each of these forms of less-than-admirable, but hardly extraordinary, behavior on the part of the parent might well "tend" to cause harm to a child in the purely directional sense of the term because each such dereliction in parental behavior could hardly be expected to have a positive impact upon the child, and therefore could only be understood to have a negative impact. This reasoning would be particularly applicable with regard to a younger child. That is, rather than being pointed in a positive direction along the continuum of bad to good behavior, such parental breaches could only, however slightly or imperceptibly, point the child toward the wrong end of the behavioral continuum. Because we cannot imagine that it was within the Legislature's contemplation that violations of MCL 750.145 be predicated on what might be momentary lapses in parental conduct rather than on an overall assessment of the child and his or her circumstances, and because we cannot imagine that the only check upon such prosecutions would be the good judgment of the prosecutor, we believe that "tend" is far more appropriately defined by its primary definition, which focuses on whether a particular result, in this case a minor coming under the jurisdiction of the family court for

10

reasons of neglect and delinquency, is "more likely than not" to occur. "[S]tatutes must be construed to prevent absurd results . . . ." *Rafferty v Markovitz*, 461 Mich 265, 270; 602 NW2d 367 (1999).[6]

By applying the more reasonable and appropriate definition of "tend" in this context as being "disposed or inclined . . . to do something," everyday lapses in parental behavior would not ordinarily suffice to lay a foundation for criminal charges that would trigger at least the *initiation* of the parental rights termination process, just as they have never before sufficed in this state to establish criminal charges under MCL 750.145.[7]

---

[6] The absurd results rule "demonstrates a respect for the coequal Legislative Branch, which we assume would not act in an absurd way." *Pub Citizen v United States Dep't of Justice*, 491 US 440, 470; 109 S Ct 2558; 105 L Ed 2d 377 (1989) (Kennedy, J., concurring); "[I]t is a venerable principle that a law will not be interpreted to produce absurd results." *K Mart Corp v Cartier, Inc*, 486 US 281, 324 n 2; 108 S Ct 1811; 100 L Ed 2d 313 (1988) (Scalia, J., concurring in part and dissenting in part); see also *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 79; 718 NW2d 784 (2006) (MARKMAN, J., concurring) ("The 'absurd results' rule underscores that the ultimate purpose of the interpretative process is to accord respect to the judgments of the lawmakers.").

[7] We consider termination to be a potentially serious consequence of a conviction for contributing to a child's delinquency or neglect under MCL 750.145, as is evidenced by the facts of this case in which the trial court in sentencing defendant for this crime expressly stated that defendant's parental rights should be terminated, and initiated the process to do so by referring defendant to the Department of Human Services. Indeed, how could any trial court react differently to a criminal conviction for "delinquency or neglect" of a minor? And indeed how could the DHS react differently than by devoting its fullest resources to the investigation of such a referral? Our point, of course, is not to suggest that termination of parental rights might not constitute an appropriate response in individual cases involving parental criminality, but only that MCL 750.145 should not be radically transformed, and broadened, so as routinely to encompass criminal conduct in which a minor is merely present, and in which there is *no* evidence that the parent's conduct actually "cause[d] or tend[ed] to cause" his or her child "to become neglected or delinquent so as to come or tend to come under the jurisdiction of the juvenile division of

11

Rather, "tend" properly takes into consideration the totality of the parent's conduct, and the overall impact of that conduct upon the child. While sociologists can debate the impact of countless types of parental behavior upon the child, and doubtless many such types of behavior can be characterized as either beneficial or detrimental to the child's upbringing, those debates do not define the proper judicial inquiry under the statute. Once again, it is not whether the parent has engaged in behavior that can be described as "tending" *toward* the wrong end of the behavioral spectrum, but whether the parent's overall behavior has made the harm that the statute was intended to prevent more likely than not to occur.

Accordingly, the statute's first use of "tend" requires a determination that a defendant's conduct has caused it to be more likely than not that a minor would "become neglected or delinquent." Similarly, the statute's second use of "tend" requires a

---

the probate court . . . ." Criminal punishment should be the only routine consequence of criminal conduct, not the termination of parental rights.

Contrary to the repeated criticisms of the dissent, our consideration of the relationship between a MCL 750.145 conviction and the termination of parental rights does not misapprehend family court jurisdiction. We fully recognize that the termination of parental rights is only *one* of the outcomes that may result from the initial exercise of family court jurisdiction. Still, the fact that the termination of parental rights is not inevitable in every such case hardly makes it any less important for this Court to consider that when a petition alleging abuse or neglect is filed because of a conviction under MCL 750.145, the likelihood of termination becomes a serious and very real possibility.

determination that a defendant's conduct caused it to be more likely than not that a minor would come under family court jurisdiction.[8]

## B. MCL 712A.2

With this understanding of MCL 750.145, we next follow that statute's directive and turn to MCL 712A.2, which sets forth the authority and jurisdiction of the family division of the circuit court. A minor may come under family court jurisdiction for either neglect or delinquency. MCL 712A.2(a) and (b).[9] Because the prosecutor's theory of this case at trial was that the child "being in [the] house [was] being subject to neglect

---

[8] Notwithstanding the dissenting justices' characterization of this discussion as "confusing," we do not think that lower courts will be confused by this standard, which requires only that courts apply a "more likely than not" analysis. Indeed, applying this standard should hardly be more difficult than applying the "'more probable than not'" standard supported by each of the presently dissenting justices in *People v Lukity*, 460 Mich 484, 494; 596 NW2d 607 (1999).

The dissenting justices also consider this discussion "unnecessary," and instead would employ their "straightforward approach" to discerning the proper meaning of "tend," which basically consists of listing the word's multiple definitions and then more or less arbitrarily inserting language found in one of these definitions into the statute with no explanation of *why* this particular definition is appropriate. As is evident to others who have considered MCL 750.145, including the prosecutor here and the Court of Appeals in *Owens*, 13 Mich App at 479, "tend" is the critical term in this statute. Depending on the meaning given to "tend," the statute can produce widely varying interpretations, some reasonable, some not. Thus, we believe our discussion concerning the proper meaning of "tend" in the context of this statute to be quite necessary, and its absence in the dissents to be quite significant.

[9] Justice CORRIGAN correctly notes that a "probable cause" standard is used to authorize jurisdiction under MCL 712A.13a(2). However, the standard applicable to a petition before a *family court* cannot transform, and should not distract from, the "beyond a reasonable doubt" standard that *jurors* are compelled to apply in this or any other criminal matter.

13

and/or delinquency," we must consider whether any of the definitions of "neglect" and "delinquency" set forth in MCL 712A.2 are pertinent here.

The jurisdiction of the family division of the circuit court over a minor for delinquency is discussed in MCL 712A.2(a)(1), which grants that court "[e]xclusive original jurisdiction superior to and regardless of the jurisdiction of another court in proceedings concerning a juvenile under 17 years of age who . . . has violated any municipal ordinance or law of the state or of the United States." This is a broad grant of jurisdiction, which notably may be exercised over a juvenile who "has violated *any* municipal ordinance or law of the state or of the United States." (Emphasis added.)

The jurisdiction of the family court over a minor for neglect is discussed in MCL 712A.2(b). The first relevant basis for a finding of neglect is detailed in § 2(b)(1), which provides that the court has jurisdiction over a juvenile under 18

> [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

This provision sets forth multiple potential grounds for a finding of neglect. The most egregious form of neglect occurs where the child has been "abandoned by his or her parents" or is "without proper custody or guardianship." Other grounds for a finding of neglect occur where the parent "neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or

14

morals," or where a child's "mental well-being" is subject to a "substantial risk of harm . . . ."

The other relevant basis for a finding of neglect under MCL 712A.2 is set forth in § 2(b)(2), which provides that the court has jurisdiction over a juvenile under 18

> [w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

For purposes of the instant case, this provision requires a finding that the home at issue constitutes an unfit place for the juvenile to live "because of" a parent's criminal act. Criminality per se, or even criminality in a home per se, is insufficient to support a finding of neglect under § 2(b)(2).

## C. STATUTES *IN PARI MATERIA*

Pursuant to the express terms of MCL 750.145, it is only through the application of the definitions of "neglect" and "delinquency" found in MCL 712A.2 that it is possible to determine whether a child "tend[s] to come" under the jurisdiction of the court. As *Owens* recognized, MCL 750.145 and MCL 712A.2 must be construed *in pari materia*. *Owens*, 13 Mich App at 475. The foregoing analyses of these statutes allow us to do just that-- to read these in tandem in order to arrive at a reasonable construction of the law.

### 1. "DELINQUENCY"

When MCL 712A.2(a)(1)'s definition of "delinquency" is incorporated into MCL 750.145, conviction under MCL 750.145 requires proof that (1) a person's "words or acts" (2) "tend[ed] to cause" any minor (3) to "become [a child who] violates *any* municipal ordinance or *any* state or federal law" (4) so as to "tend to come" under family

15

court jurisdiction for delinquency.[10]   Thus, conviction under MCL 750.145 for contributing to a child's delinquency requires proof that would allow the fact-finder to determine that a person's "words or acts" caused it to be more likely that a minor would become a child who breaks the law than that he would remain law-abiding.

These standards-- and the interpretation of "tend" from which they derive-- are consistent with those used by Michigan courts for almost a half-century where they have been asked to construe MCL 750.145.  When *Owens* first addressed this statute, although it recognized that a prior adjudication is unnecessary to sustain a conviction under MCL 750.145, the Court nonetheless focused on the particular minor at issue and identified a particular act of delinquency that the defendant "tended to cause."  In affirming the defendant's conviction, *Owens* reasoned that his actions "tended to cause" the minor at issue to commit the alleged act of delinquency, even though "she had not yet been adjudged delinquent by the probate court prior to defendant's trial."  *Owens*, 13 Mich App at 479.

Since *Owens*, there have been few cases addressing "sufficiency of the evidence" challenges to convictions under MCL 750.145 based on grounds of delinquency-- a fact that suggests that the state's justice system has arrived at a generally accepted equilibrium for prosecuting this crime.[11]  However, the appellate decisions that *have*

---

[10] The trial court did not provide the jury with the statutory definition of "neglect" or "delinquency" found in MCL 712A.2, as MCL 750.145 requires.

[11] From the available caselaw, it appears that most convictions under MCL 750.145 have been unchallenged, and have arisen in cases in which the defendant has

16

specifically analyzed sufficiency of the evidence challenges to convictions under MCL 750.145 employ a common approach. As with *Owens*, these courts identify a *particular* child and a *particular* act of delinquency as defined by MCL 712A.2(a). They then have assessed whether, because of the defendant's actions, the child committed, or was at risk of committing, a specific act of delinquency. See, e.g., *People v Antjuan Owens*, unpublished opinion per curiam of the Court of Appeals, issued September 11, 2007 (Docket No. 271064), lv den 480 Mich 1012 (2008) (sustaining the defendant's conviction, based on finding that the "[d]efendant's actions placed [the minor at issue] in danger of, at the least, being charged with loitering in a place of illegal business under MCL 750.167[1][j]"); *People v Jackson*, unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket No. 275908) (sustaining the defendant's conviction, based on finding that the defendant's actions caused the minors at issue to be charged with the crime of attending a dog fight).

These decisions reflect the existing, and proper, approach to understanding MCL 750.145 construed *in pari materia* with MCL 712A.2. The children at issue were at risk of committing identifiable acts of delinquency, and it was possible to conclude that they

---

provided alcohol or drugs to a minor-victim, often as a prelude to the defendant's criminal sexual conduct. See, e.g., *People v Stokes*, unpublished opinion per curiam of the Court of Appeals issued July 22, 2008 (Docket No. 276839); *People v Bursler*, unpublished opinion per curiam of the Court of Appeals, issued September 9, 2008 (Docket No. 277473); *People v Latta*, unpublished opinion per curiam of the Court of Appeals, issued February 17, 2009 (Docket No. 281297).

were more likely than not to become delinquent, and consequently more likely than not to come within family court jurisdiction.

## 2. "NEGLECT"

As noted above, MCL 712A.2(b) provides multiple definitions of "neglect," which all must be read in conjunction with, and incorporated into, MCL 750.145. When this is done, conviction under MCL 750.145 requires proof that (1) a person's "words or acts" (2) "tend[ed] to cause" any minor (3) to become a child: (i) who is abandoned by both parents or lacks proper custody; (ii) whose parents fail to provide the necessary care for his or her physical, educational, and moral needs; (iii) whose "mental well-being" is subject to a "substantial" risk of harm; or (iv) whose home is "unfit" "because of" a parent's "criminality" (4) so as to "tend to come" under family court jurisdiction for neglect. Thus, a conviction based on for neglect requires proof allowing the fact-finder to conclude that, more likely than not, the child will fall under one of the definitions of "neglect" in MCL 712A.2(b), and thus, more likely than not, will fall within family court jurisdiction.

There are no reported Michigan cases that address a conviction under MCL 750.145 on grounds of neglect. At oral argument, the prosecutor suggested that the closest Michigan case to the case at bar was the Court of Appeals unpublished decision in *Antjuan Owens*. Although *Antjuan Owens* rested its holding sustaining the defendant's conviction on grounds of delinquency, and in doing so followed established Michigan law, we agree that this case also affords insight into what evidence is sufficient to sustain a conviction based on neglect. There, the police raided a home and found only the

18

defendant and his 13-year-old nephew inside. When the police entered, the defendant immediately ran to the basement and tried to dispose of cocaine he had in a plastic bag, leaving a revolver in plain view on the dining room table. Although the house had electricity and heat, it had no food or furniture, and was full of trash and animal feces. These facts would clearly enable a fact-finder to find grounds for neglect, either under MCL 712A.2(b)(2), because the "criminality" of a non-parent adult rendered the home an "unfit place" for a juvenile to live, or under MCL 712A.2(b)(1), because the child was not receiving the necessary care for his health, education or morals, or because his "mental well-being" was subject to a "substantial" risk of harm.

## D. APPLICATION

The essential elements derived from construing MCL 750.145 *in pari materia* with MCL 712A.2 require us to determine whether, taking the evidence in the light most favorable to the prosecutor, a rational trier of fact could find that defendant's actions "tended to cause" the child to become delinquent or neglected, such that the child "tended to come" under family court jurisdiction.

## 1. "DELINQUENCY"

The prosecutor contends that defendant's conviction can be sustained on grounds of delinquency.[12] Referencing statutes that prohibit the possession and use of a

---

[12] Similarly, the trial court focused on delinquency as its rationale for how the child would "tend to come" under family court jurisdiction, stating at sentencing:

> [W]e've got a situation where someone who's committing criminal activity and has a young child in the house and that young child thinks,

19

controlled substance, the prosecutor argues that defendant's actions "tend[ed] to cause" the child to violate these statutes and, thus, become a delinquent so as to "tend to come" under family court jurisdiction. The prosecutor supports this argument with social science research that suggests that children of parents who abuse drugs are more likely to abuse drugs themselves.

As a threshold matter, we note this research was not part of the proofs considered by the jury. However, even if it had been, we find the prosecutor's argument inapt under MCL 750.145. First, while this argument is purportedly focused on the child involved in this case, the research is based on the life experiences of *other* children.[13] Second, this argument does not properly construe "tend." As explained, the word is commonly understood to require a level of certainty that would allow the fact-finder to determine that defendant's actions "tended to cause" this particular child to become delinquent. Whatever the social science research cited by the prosecutor may reveal about the children who were the studies' subjects, or even about similarly situated children in

---

> well, daddy does it, I can do it, too. You know, good grief. And it just gets—it just goes on and on and on and on. So that your life is not the only one that's ruined, but all the people that you love as well.

Although both the prosecutor and the trial court concentrated on delinquency as the applicable grounds for defendant's conviction, the dissents do not discuss this ground at all.

[13] If, for example, social science research further suggested some correlation between exposure to violent video games and aggressiveness in children, or between divorce and behavioral problems, or even between poverty and delinquency, then could anything on the part of the parent contributing to these circumstances "tend" to contribute to a child's delinquency?

general, it is not focused on *this* child and *his* particular life experience, such that it provides proof beyond a reasonable doubt that defendant's actions "tended to cause" *this* child-- the "such child" expressly referenced in MCL 750.145-- to violate a controlled substance statute. Defendant, as with any other criminal defendant, is entitled to have his particular circumstances assessed, not those of persons collected together to participate in a university research project.

While this Court is ill-equipped to assess the merits of the research cited by the prosecutor, as a reviewing court with the full record before us, we *do* possess the tools, and *are* charged with the duty, to ensure that the "sufficiency of the evidence" standard is met. Taking the evidence in the light most favorable to the prosecutor, we are unable to conclude that a rational juror could have determined that defendant's actions "tended to cause" the child to become delinquent. By his presence in the home, the child did not violate, nor was he in danger of violating, any "municipal ordinance or law of the state or of the United States." Nor does the record contain any evidence whatsoever that the child was "disposed or inclined" to abuse drugs, engage in criminality, or become a delinquent for any other reason. Quite simply, the prosecutor presented *no* evidence regarding the child's education, behavioral history, relationships with his peers, or any other relevant fact that could support the conclusion that defendant's actions "tended to cause" *this* child, to become delinquent. Therefore, no matter how favorably we interpret the evidence in the prosecutor's favor, as we are required to do, defendant's conviction cannot be sustained under MCL 750.145 on the grounds of delinquency. There simply was no evidence of any kind to sustain such a conviction.

## 2. "NEGLECT"

The prosecutor also argues that defendant's conviction can be sustained on grounds of neglect. Specifically, the prosecutor argued to the jury that the child "being in that house is being subject to neglect and/or delinquency." Again, we conclude that the evidence is insufficient to allow a rational fact-finder to make such a finding. There was simply no evidence presented that the illegal drugs or firearms at issue had any impact on the child's "mental well-being" or his "health and morals," as there was no evidence at all that he was even *aware* of these items, much less of their illegality. The child's awareness of the illegal items is critical, if not dispositive, in this case because the overall evidence is so very sparse. To review, the evidence indicated that the child was found on the couch in the living room; he had his own bedroom; drugs were found under the bed in the parents' bedroom; the firearms were found in a dresser drawer in the parents' bedroom; he started crying when the police entered his home; and his mother was handcuffed and given a citation. *Everything* the jury knew about this child was in relation to his presence in the home at the moment of the raid; the jury knew these facts and it knew nothing more. By resting her case on a theory that the child's presence in the home plus illegal activity in the home amounts to a violation of MCL 750.145, the prosecutor made the child's awareness of the illegal activity critical to sustaining defendant's conviction. How else could a rational juror conclude that the child's "mental well-being" was placed at "substantial risk" unless the child was aware of the firearms and drugs? How else could a rational juror conclude that defendant "refuse[d] to provide proper . . . care necessary for [the child's] health or morals" where no evidence was

22

presented concerning the care defendant did, or did not, provide the child? There is nothing here *beyond* the child's awareness that could even conceivably establish that he had been affected by his parent's criminal activity, much less caused to become delinquent as a result, and there is no evidence of awareness.[14]

---

[14] Absent any evidence of the child's awareness, the dissenting justices offer two largely irrelevant and distracting facts to sustain defendant's conviction: (l) that the child's mother was "arrested"; and (2) that the child started crying when the police raided defendant's home. In doing this, the dissents do nothing more than reiterate their theory that the child's presence plus illegal activity in the home amounts to a separate criminal violation. Concerning the "arrest," while one officer testified that the mother was "arrested," it appears that the officer used this phrase to explain only that the mother had been "forcibly restrained," not that she was taken into custody. This is consistent with the testimony of another officer who, when asked if the mother was "arrested," clarified that she had been written a "ticket." That the officers ticketed the mother at the scene is confirmed by the police activity log. That neither officer indicated the mother was ever removed from the home explains why the prosecutor, unlike the dissenting justices, never pursued the argument that the child was ever left "without proper custody."

Concerning the child's crying, while Justice CORRIGAN is undoubtedly correct that an in-home arrest is "traumatic" to all concerned, especially to children, we do not believe that this evidence sustains a conviction under MCL 750.145. Raids, arrests, and incarcerations are unavoidable aspects of the criminal justice process, and for these to suffice to establish a separate criminal conviction would render an MCL 750.145 prosecution a nearly automatic appendage of every criminal offense in which a child is merely present in a home. Indeed, under the theory of the dissents, it would seem that MCL 750.145 could be triggered even where there is no contraband in the home and an arrest occurs there, even where the arrested person is not a parent, and even where the parent is arrested elsewhere and the police come to a home in order to communicate this information or to search for evidence. There can hardly be any doubt that the impact of a loved one becoming entangled in the criminal justice process may be devastating to a child, even permanently so. However, precisely because this impact is manifest in every case in which a parent or other person important in a child's life has been charged with a crime, we do not believe that the consequences that inexorably flow from a person's involvement in the criminal justice process are what is contemplated by a "substantial risk of harm" to a child's "mental well-being." Rather, MCL 750.145 is focused on the impact upon the child of the "acts" themselves, not that of the criminal justice process itself.

23

The other relevant ground for a finding of neglect is under MCL 712A.2(b)(2), which requires a causal connection between defendant's "criminality" and a finding that his home "as a result" constitutes an "unfit" place for the child to live. Although two criminal acts form the basis of defendant's convictions-- the illegal possession of drugs and firearms-- the charging information for the MCL 750.145 violation did not even refer to the firearms. It stated only that defendant had contributed to the neglect or delinquency of the child by "exposing him to the use and sale of narcotics." Arguably, then, defendant's criminal act of illegally possessing firearms is immaterial to his MCL 750.145 conviction. However, because the prosecutor argued on appeal that the presence of firearms in defendant's home put the child at risk for neglect or delinquency, and the Court of Appeals agreed, we will consider the impact of both criminal acts on the child's home.

Here also, the absence of evidence that the child was aware of the possession of the drugs and firearms is largely dispositive.[15] On the record, no rational fact-finder

---

[15] Moreover, defendant's criminality surrounding the firearms is predicated upon his *status* as a convicted felon. Absent this status, the firearms found in defendant's bedroom are indistinguishable from those found in hundreds of thousands of homes in Michigan. A firearm is a firearm, and unless a child is aware that a firearm is possessed unlawfully, it is hard to understand what distinction there could be in that child's mind between a legal and an illegal firearm, and what difference there could be in causing him to become delinquent or neglected. Furthermore, although the dissenters decry the fact that the firearms found in a drawer in defendant's bedroom were "unsecured" and "loaded," it is not illegal in this state to store firearms in this manner. Indeed, such storage would not be uncommon in the case of persons who rely upon these for personal and family self-defense. We point this out not to minimize defendant's criminal conduct, for his drug and firearms convictions are not altered in any way by this case, but to indicate why something more than mere awareness of, or exposure to, a firearm is

24

could find beyond a reasonable doubt that the home was rendered "unfit" "by reason of" the presence of these illegal possessions because the record does not establish that this criminality had *any* impact on the child's home.

Nor, in contrast to the home in *Antjuan Owens*, was there any indication that defendant's home was a "drug-house," subject to an influx of drug purchasers, or otherwise unsanitary or uninhabitable. Rather, the record established only that the house was a furnished two-bedroom home. There is nothing from the evidence that suggests that the physical condition of the home made it in any way "unfit" for a juvenile to live in. Taking this evidence in the light most favorable to the prosecutor, we conclude that a rational trier of fact could not reasonably find that defendant's home was rendered an "unfit place" for the child to live "by reason of" defendant's criminal conduct where there was no evidence at all that the child was even aware of this criminality.

Therefore, once again, no matter how favorably we interpret the evidence in the prosecutor's favor, defendant's conviction cannot be sustained under MCL 750.145 on the ground of neglect. We are not prepared to accept the dissents' syllogism that the child's presence in the home plus illegal activity in the home equates to a violation of MCL 750.145.

---

required before it can be considered as contributing to the delinquency of a child or as evidence of neglect. At the same time, we reiterate that there is not even evidence that the child was aware of, or exposed to, a firearm in this case.

## IV.  SLIPPERY SLOPE

In deciding this case, like all cases, we are conscious that our judicial duty is "to declare what the law is . . . ." *Wilson v Arnold*, 5 Mich 98, 104 (1858).  In attempting to discharge this duty, we have relied on traditional tools of interpretation to determine what constitutes the most reasonable meaning of relevant statutory provisions.  Accordingly, our holding rests on the conclusion that defendant's conviction cannot be sustained in accordance with the most reasonable interpretation of MCL 750.145 construed *in pari materia* with MCL 712A.2.

However, we would be derelict if we did not comment further on the very steep slippery slope down which our legal system would be headed if this statute were to be given the interpretation urged by the prosecutor and the dissents, and adopted by the lower courts.  We have already commented upon the extraordinarily broad, and arguably absurd, applications of MCL 750.145 resulting from an unreasonable interpretation of "tend."  However, it is also incumbent on us to point out that another, equally steep, slippery slope would be created if we were to find that a criminal conviction, *by itself*, constitutes a basis for a neglect or delinquency conviction under MCL 750.145.  And that is what is involved in this case: a "by itself" criminal conviction serving as a basis for a neglect or delinquency conviction.  Although the dissents disagree, they do not identify any relevant evidence that was presented to the jury other than the fact of the child's presence in a home where the illegal activity occurred.  Indeed, the dissents *cannot* point to such evidence because the prosecutor presented nothing more.  There is no evidence of the child's awareness that defendant was engaged in criminal behavior; there is no

26

evidence of the child's awareness of any contraband in his home; there is no evidence that the physical or other conditions of the home were unfit in any way for the child; there is no evidence that the educational, moral, physical, or psychological needs of the child were being neglected; and there is no evidence that defendant's conduct had any adverse impact on the child. There is simply the fact that defendant was convicted of crimes that occurred in a home in which a child lived.

The prosecutor and the dissents would also effectively read out of the statute language requiring a *causal connection* between a defendant's "criminality" and a finding that his home is "unfit" for a juvenile. No further showing would be required in order to establish a violation of MCL 750.145 than that a crime occurred in a home and that a child was present. Such a predicate for a violation of this statute has never before been thought sufficient. Presumably, prescription drug abuse, tax fraud, unlicensed work, possession of illegal "numbers" tickets or gambling paraphernalia, computer "hacking," check kiting, illegal possession of music downloads or "pirated" DVDs, the possession of unlawful fireworks, allowing the illegal consumption of alcohol at family gatherings, and countless other criminal offenses that occur within, or have an impact upon, the home could all serve as grounds for supplemental criminal charges of "neglect and delinquency," if not, as occurred here, as a basis for triggering an inquiry into whether parental rights should be terminated.

At oral argument, the prosecutor appeared to recognize this slippery slope. When asked whether a hypothetical case involving a parent's possession of an illegally scalped sporting or entertainment event ticket would fall within the statute, the prosecutor

responded, "I don't know. I don't think I would feel comfortable arguing to a jury that going to a football game with some tickets bought from a scalper produces the substantial risk [to] mental well-being. I don't think that does fall within the statute." When asked if she was suggesting that this Court rely exclusively on the good judgment of the prosecutor not to bring such a case rather than on the law itself, the prosecutor answered, "Well, and if the prosecutor misuses their judgment you would deal with it in the appropriate case as well." However, this Court does not review the discretionary charging judgments of the prosecutor, but rather the prosecutor's compliance with the law. And despite the prosecutor's initial assertion in this case that ticket scalping "does [not] fall within the statute," it is clear that there is no basis whatsoever in the prosecutor's own interpretation of the law that would allow for a ticket-scalping exception or that would distinguish between criminal offenses.[16]

---

[16] Although Justice CORRIGAN attempts to limit the potentially sweeping scope of the rule she would adopt, in the end, under her interpretation, the only thing standing athwart a judicially created crime wave for "delinquency or neglect" will be the good judgment of prosecutors, and that cannot be the exclusive safeguard of the people. Despite the focus of MCL 712A.2(b)(1) on harm being done to a child's "health *or morals*," her dissent imposes its own limitation on the statute, whereby only crimes that involve "inherently dangerous items unsecured in the home" could act as the basis for a conviction under MCL 750.145. Under this self-created limitation, which has no basis in the statute, defendant's illegal possession of unsecured firearms will invariably support a conviction.

Even more remarkably, Justice CORRIGAN expresses "no opinion concerning the circumstances under which a jury could convict a *law-abiding* gun owner of a misdemeanor under MCL 750.145 because he maintained multiple loaded, accessible guns in a manner that posed significant harm to a child." Her silence on this subject is pregnant and significant in suggesting the even-more-remarkable proposition that, under the rule of the dissent, the hundreds of thousands of people in this state who keep

Although we do not question in any way the sound judgment of Michigan prosecutors, including, and especially, the prosecutors in this case, the decisions of this Court cannot in the end rest on confidence in the judgment of prosecutors. Rather, these decisions must rely on the law. We respectfully reject the prosecutor's reading of MCL 750.145, because we believe it is wrong and reads out of that statute the requirement that there be a *causal connection* between defendant's criminal conduct and a child's neglect or delinquency. However, to the extent that there is any concern about the slippery slope that has been identified, we are not assuaged by the assurance that this problem can be ameliorated by the exercise of prosecutorial discretion.

---

"unsecured" firearms in their homes in the interest of their and their family's self-defense, *could* be susceptible to criminal charges under MCL 750.145 at the discretion of the prosecutor, even where such possession is lawful and no crime has been committed that pertains to the home. It appears that the dissent is forced into this remarkable statement of "no opinion," because, under its logic, there is no principled way to distinguish between defendant's firearm and that of a law-abiding gun owner. That is, an illegal, unsecured firearm is no more or less "inherently dangerous," or likely to cause "neglect or delinquency," than a legal firearm. Moreover, given the dissent's lack of concern with the fact that the prosecutor presented absolutely no evidence that the child was even aware of, or exposed to, the firearms, it is apparently the fact that contraband exists in a home alone that sustains a "delinquency or neglect" conviction.

Moreover, if, as the dissents necessarily argue, the mere presence of contraband is "inherently dangerous" to the child's *health*, there is no principled reason why the mere presence of other contraband, such as false tax returns, would not be "inherently dangerous" to the child's *morals*. Finally, by suggesting that this case would be different "if defendant had been arrested on the street and had kept his guns and drugs outside the home," Justice CORRIGAN merely underscores the validity of our criticism that where contraband is *not* located "outside" the home, but "inside," and a child is merely present, a criminal violation will routinely be established under her interpretation of MCL 750.145.

29

## V.  RESPONSE TO DISSENTS

In their dissents, Justices CORRIGAN and YOUNG take issue with our interpretation of the relevant statutes, our application of the law, and, most insistently, with the result that we reach.  While we have addressed discrete points of disagreement throughout this opinion, it is necessary to respond more generally to our differing perspectives.

First, we respectfully disagree that this case is as "simple" as the dissenters would have it.[17]  Rather, this case requires consideration of two statutes, each of which employs language with multiple definitions that could produce varying interpretations.  Moreover, the propriety of a conviction under MCL 750.145 based on the kind of facts that exist here constitutes not only a matter of first impression but would, in our judgment, lead to the increasingly routine use of MCL 750.145 as a supplemental charge in cases in which contraband is located in a home and there is also a child present in that home.  Thus, it is entirely appropriate for this Court to thoroughly consider this statute before it is applied in ways never before contemplated in the statute's more than six-decade history.  In doing so, we have used traditional tools of interpretation to discern the intent of the Legislature, an approach to statutory interpretation that we would not expect the authors

---

[17]    The dissenting justices criticize the analysis in this opinion as "lengthy," "unnecessary," and "confusing," and avoid their own lengthiness, unnecessariness, and confusion largely by avoiding analysis at all.  Concerning the critical term in question, "tend," the dissents manage not to address the various meanings of this term, not to select among these meanings, and not to justify a preferred meaning.  If it is the avoidance of a "lengthy" analysis that the dissents desire, they succeed with flying colors.  When Justice YOUNG states that "[o]nly a lawyer" could produce the result reached in this opinion, this appears to be shorthand for the promise that there will be no serious analysis of the law in *his* opinion, and he lives up to this promise.

of the dissents to find objectionable. In particular, we fail to see how this opinion is "disloyal to the plain text" of the relevant statutes, or that it is based on a "speculative belief about the Legislature's intent," whatever the latter phrase means. We find these characterizations especially ironic in view of the fact that the dissenting opinions barely engage at all in the threshold task of statutory interpretation. Thus, it is difficult to point to specific areas of disagreement concerning our respective analyses; rather, the principal difference between our approaches seems to be whether the statute is or is not so "simple" that it requires any analysis at all.

Second, unlike the dissents, we find it significant that a conviction under MCL 750.145 based on neglect-- the only ground that the dissents discuss at all-- is unprecedented in this state.[18] The dissents cite no caselaw to support the result they reach because no such caselaw exists. Further, unlike the dissents, we find it significant that the facts of this case are substantially far afield from the case the prosecutor offered as its closest factual analogue. Yet despite the dissents' apparent recognition that there is no evidence to sustain defendant's conviction on grounds of delinquency, despite the fact that there is *no* caselaw in Michigan to support their argument based on neglect, and despite the fact that the case the prosecutor offered is factually inapposite, the dissents would apply this statute in a way that has never before been contemplated in the statute's over 60-year history, without even taking notice of the absence of authority for their

---

[18] From the absence of discussion of delinquency, we assume that the dissents recognize that there is no evidence in this record to sustain defendant's conviction on this ground.

31

position.  We believe that the prudent exercise of our judicial responsibilities at least requires us to consider relevant authority, or the lack thereof, before taking the law of this state into uncharted territory.

Third, we disagree with the dissents that it is we who misconstrue the "sufficiency of the evidence" standard.  This standard makes clear that a reviewing court is required to take the *evidence produced at trial* in a light favorable to the prosecutor.[19]  As such, this standard does *not*, and never has, require the affirmance of every criminal conviction, as might be the case if a reviewing court were instead to view the prosecutor's preferred *outcome* in a light favorable to the prosecutor.  As already discussed, the prosecutor here produced *no evidence* at trial relevant to the MCL 750.145 charge, other than the fact that the child was present in the home when the contraband was found.  We agree with the dissents that this statute is designed to capture behavior injurious to children, and thus find it highly significant that the record is so bereft of evidence concerning the *child*.  The dissents have been more diligent than the prosecutor herself in seeking to sustain this charge, with the latter having barely mentioned the charge in closing argument and having chosen not even to address the elements of the crime, or define the operative statutory language, for the jury.  However, it is the arguments of the *prosecutor* that this

---

[19] "One of the rightful boasts of Western civilization is that the (prosecution) has the burden of establishing guilt solely *on the basis of evidence produced in court* and under circumstances assuring an accused all the safeguards of a fair procedure." *Irvin v Dowd*, 366 US 717, 729; 81 S Ct 1639; 6 L Ed 2d 751 (1961) (Frankfurter, J., concurring) (emphasis added).

Court assesses, not those of dissenting justices.[20] The prosecutor did not satisfy even her minimal burden of presenting *some* evidence at trial that would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. Sustaining defendant's conviction on this record would simply eviscerate the "sufficiency of the evidence" requirement that is "'part of every criminal defendant's due process rights.'" *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999) (citation omitted).[21]

## VI. CONCLUSION

We recognize that the facts here engender no sympathy for defendant. It is easy to understand, and even applaud, the admonition delivered by the trial court to defendant at sentencing, when it stated, "I'm not going to tolerate this kind of behavior by a parent of a child in this state." As with the trial court and the dissents, we desire more for the

---

[20] Again, the prosecutor argued that the child's "being in that house is being subject to neglect and/or delinquency."

[21] Because of lack of evidence produced at trial, the dissents turn to evidence that was not presented at trial to sustain defendant's conviction. In doing so, they forget that the prosecutor "has the burden of establishing guilt solely *on the basis of evidence produced in court. . . .*" *Irvin*, 366 US at 729 (Frankfurter, J., concurring) (emphasis added). For instance, Justice YOUNG's dissent places great weight on the fact that "the trial court did, in fact, recommend to the Department of Human Services that the court exercise jurisdiction over the child," albeit on the basis of the same failure to assess the applicable law as the dissenting justices. Nonetheless, this fact was not in evidence because the trial court did not make this recommendation *until sentencing*. Likewise, the jury was not presented with evidence of defendant's "open use of heroin," as Justice YOUNG suggests, or that defendant was a "repeat drug-offender," as noted by Justice CORRIGAN. And, as already noted, the jury did not consider the social science research offered by the prosecutor on appeal.

children of this state than a parent who keeps contraband in the home. The fact remains that the evidence presented in this case cannot sustain defendant's conviction under MCL 750.145, and, if it could, we could expect to see this statute increasingly employed in ways that have not been contemplated in its long history and in situations that go far beyond what we believe was intended by the Legislature.

On the facts of this case, where the jury was presented with no evidence other than that a child was present in a home where criminal activity occurred, we hold that a rational fact-finder could not conclude beyond a reasonable doubt that defendant "tend[ed] to cause" the child to become delinquent or neglected so as to "tend to come" under family court jurisdiction, as those terms are defined by MCL 712A.2. To adopt the theory that a child's presence in the home plus illegal activity in the home amounts to a violation of MCL 750.145 is inconsistent with the language of this statute, and incompatible with past judicial practice in this state. Moreover, it would transform MCL 750.145 into an increasingly routine appendage to other criminal charges, serving thereby as an increasingly routine trigger for the initiation of proceedings by the Department of Human Services for the termination of parental rights. We reverse in part the judgment of the Court of Appeals, vacate defendant's conviction under MCL 750.145, and remand to the trial court for further proceedings. Defendant's convictions for drug and firearm possession remain intact.

KELLY, C.J., and CAVANAGH and HATHAWAY, JJ., concurred with MARKMAN, J.

34

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                            No. 137755

GEORGE WALTER TENNYSON,

      Defendant-Appellant.

_____

CORRIGAN, J. (*dissenting*).

I would affirm defendant's misdemeanor conviction for contributing to the neglect or delinquency of a minor under MCL 750.145. The Court of Appeals correctly concluded that "there was sufficient evidence for the jury to infer that defendant's illegal activities could have subjected his [step]son to the jurisdiction of the courts."[1] At a minimum, defendant's commission of drug- and weapons-related crimes in the 10-year-old child's home constituted "act[s]" that "encourage[d], contribute[d] toward, cause[d] or tend[ed] to cause" the child to become "neglected . . . so as to come or tend to come under the jurisdiction of the juvenile division of the probate court . . . ." MCL 750.145. Defendant kept heroin and loaded weapons unsecured in the family home. Further, his acts precipitated a police raid on the home in the child's presence. As a result of the raid,

_____

[1] *People v Tennyson*, unpublished opinion per curiam of the Court of Appeals, issued October 16, 2008 (Docket No. 278826), p 4.

both of the child's caregivers—defendant and his wife, the child's mother—were arrested. This evidence was sufficient for a jury to conclude that defendant's crimes contributed toward or tended to cause the child to come under the jurisdiction of the probate court because the crimes deprived the child of "care necessary for his . . . health or morals," created a "substantial risk of harm to his . . . mental well-being," or resulted in an "unfit" home by reason of "neglect" or "criminality." MCL 712A.2(b)(1) and (2). Indeed, as a result of the crimes, the trial court formally requested an investigation of possible neglect or abuse by the Department of Human Services.

## I. FACTS AND PROCEEDINGS

Defendant is a repeat drug offender. On August 16, 2006, officers with the Narcotics Section of the Detroit Police Department executed a warrant to search for drugs in defendant's home. They knocked on defendant's door and ultimately forced it open and entered the home. They found a small boy—defendant's 10-year-old stepson— sitting alone on the living room couch. The boy was scared and crying. He was dressed only in his underwear.

The officers discovered defendant sitting on a bed in one of the home's two bedrooms. They observed a plastic bag filled with heroin on a plate under the bed. They also found a digital scale used for weighing narcotics and two loaded handguns in the drawer of his bedroom dresser. Finally, the officers confiscated cash that they believed was proceeds from narcotics sales. Both defendant and his wife, the boy's mother, were arrested and handcuffed at the scene. A jury convicted defendant, as charged, of possession of less than 25 grams of heroin, MCL 333.7403(2)(a)(*v*), possession of a

2

firearm during the commission of a felony, MCL 750.227b, unlawful possession of a firearm by a felon, MCL 750.224f, and contributing to the neglect or delinquency of a minor, MCL 750.145.

## II. STANDARD OF REVIEW

When considering whether the evidence presented at trial was sufficient to support a conviction, a reviewing court must view the evidence in the light most favorable to the prosecution. *People v Wright*, 477 Mich 1121, 1122 (2007). "A reviewing court need not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.*, quoting *Jackson v Virginia*, 443 US 307, 319; 99 S Ct 2781; 61 L Ed 2d 560 (1979) (additional quotation marks and citation omitted). "Rather, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Wright*, *supra* at 1122, quoting *Jackson*, *supra* at 319 (emphasis omitted).

## III. ANALYSIS

### A. MCL 750.145

MCL 750.145 provides:

> Any person who shall by any act, or by any word, encourage, contribute toward, cause or tend to cause any minor child under the age of 17 years to become neglected or delinquent so as to come or tend to come under the jurisdiction of the [family] division of the [circuit] court, as

3

defined in [MCL 712A.2], whether or not such child shall in fact be adjudicated a ward of the . . . court, shall be guilty of a misdemeanor.[2]

Significantly, the statute does not require the evidence to show that a defendant's acts *actually* caused the child to come under the court's jurisdiction. Rather, the text establishes a fairly low threshold, asking whether a defendant's acts *encouraged, contributed toward,* caused, *or tended to cause* a child to come *or tend to come* under the court's jurisdiction. And, crucially, the statute applies "whether or not such child shall in fact be adjudicated a ward" of the court.

First, as the majority opinion observes, the statute twice employs the word "tend." "Tend" is a commonly used word that needs little explanation.[3] According to *Random House Webster's College Dictionary* (2d ed), "tend" means in relevant part:

---

[2] The statutory language has been altered to reflect the transfer of jurisdiction from the probate court to the family division of circuit court. See MCL 600.1021(1)(e); MCL 712A.1(1)(c). See also MCL 600.1009.

[3] I find the majority's lengthy discussion of "tend" unnecessary and confusing. The majority accuses me of "avoiding analysis at all" and failing "to address the various meanings of this term . . . ." But this Court's duty is to ascertain the plain, everyday meaning of non-technical statutory words. MCL 8.3a; *Grievance Administrator v Underwood*, 462 Mich 188, 194; 612 NW2d 116 (2000) ("[C]ommon words must be understood to have their everyday, plain meaning . . . ."). Justice MARKMAN himself has observed that "[t]he 'common understanding' of most words is that they possess their plain and ordinary meanings." *Mich United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 397-398; 630 NW2d 297 (2001) (MARKMAN, J., concurring). As the author of the majority opinion here, he opines that "tend" conveys that "something is 'more likely than not' to occur" and he candidly states: "This common understanding of 'tend,' I believe, is taken for granted in everyday speech." Indeed, the majority ultimately settles on this definition which, incidentally, I believe largely complements the definitions I list and would lead to my result if applied under the proper standard of review while taking full account of the record facts. Under such circumstances, I fail to see how my straightforward approach avoids any necessary

4

1. to be disposed or inclined in action, operation, of effect to do something . . . . 3. to lead or conduce, as to some result or condition . . . . 4. to be inclined to or have a tendency toward a particular quality, state or degree . . . . 5. (of a course, road, etc.) to lead or be directed in a particular direction . . . .

*Webster's* defines "tendency" in relevant part as follows: "1. a natural or prevailing disposition to move, proceed, or act in some direction or toward some point, end, or result. 2. an inclination, bent, or predisposition to something." *Id.* Finally, *Webster's* states that to "predispose" is "1. to make susceptible or liable: *genetic factors predisposing us to disease*. 2. to dispose beforehand; incline; bias." Thus, MCL 750.145 essentially requires a jury to conclude that a defendant's acts would naturally lead to, or make a child susceptible to, court jurisdiction.

Second, a defendant's acts need not actually cause, or be the sole cause of, a tendency toward the court having jurisdiction over the child. Rather, it is sufficient for a jury to conclude that the acts "encourage[d]" or "contribute[d] toward" such a tendency.[4]

---

analysis. Compare *Burlington N & F R Co v United States*, ___ US ___, ___; 129 S Ct 1870, 1879; 173 L Ed 2d 812, 823 (2009) (using two brief sentences to define "arrange" as it appears in 42 USC 9607(a)(3) according to "common parlance," two relevant dictionary definitions, and a case citation); *Sington v Chrysler Corp*, 467 Mich 144, 155; 648 NW2d 624 (2002) (defining "capacity" as used in MCL 418.301(4) by reference only to the single, most pertinent definition in a common dictionary); *Grievance Administrator*, 462 Mich at 194 (defining "guidelines" as used in MCR 9.118(A)(3) by reference to a single dictionary definition); *People, ex rel Simmons v Anderson*, 198 Mich 38, 45; 164 NW 481 (1917) ("[W]ords used by the Legislature should be understood in their common rather than in a technical *or a related sense not plainly apparent*.") (emphasis added).

[4] The majority focuses on the Legislature's use of the word "tend" in MCL 750.145 "because it requires the lowest threshold of proof." It is not immediately

MCL 750.145. The only relevant definition of "encourage" found in *Webster's* is "to promote; foster." *Random House Webster's College Dictionary* (2d ed). *Webster's* further states that to "contribute to" means "to be an important factor in." *Id*. Thus, to find a defendant guilty of this misdemeanor, a jury need only conclude that the defendant's acts promoted, or were an important factor in, a child's susceptibility to the court's jurisdiction.

Finally, the statute not only lacks any requirement that *actual* court jurisdiction be realized, it also does not require that the child become a ward of the court if the court does actually assume jurisdiction as the result of alleged abuse or neglect. As I explain further below, an order assuming court jurisdiction over a child is distinct from an order rendering the child a court ward. The court may take initial jurisdiction in order to ensure that a child is protected, but the child may never become a court ward; that is, he may not be removed from his parents' care although conditions justifying initial jurisdiction are present. Further, even if the child becomes a court ward, this status does not necessarily lead to termination of parental rights; the child may simply become a temporary ward. MCL 712A.20. Because MCL 750.145 applies although the child may never even become a *temporary* ward of the court, the Legislature has signified that a misdemeanor conviction under MCL 750.145 is appropriate although a child is susceptible only to the beginning stages of court jurisdiction. A conviction is not predicated on the child's

obvious to me that acts *tending* to cause delinquency or neglect require less proof than do acts *encouraging* or *contributing toward* delinquency or neglect.

6

susceptibility to being removed from his parents' care, let alone on termination of their parental rights.

## B. MCL 712A.2

Because a jury must be able to conclude that a defendant's acts affected a child's tendency to come under the court's jurisdiction as defined in MCL 712A.2, we must also address MCL 712A.2. The prosecutor here argued that defendant's acts tended to cause court jurisdiction as a result of both delinquency and neglect. I focus on neglect because the evidence on this point is particularly strong.[5] Pursuant to MCL 712A.2(b), the family division of the circuit court may take jurisdiction over a child:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . . [or]
>
> * * *
>
> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. [MCL 712A.2(b).]

---

[5] A conviction under MCL 750.145 may be based on a defendant's act or word that encourages, contributes toward, causes or tends to cause a child *either* to become "neglected *or* delinquent" so as to come or tend to come under court jurisdiction. MCL 750.145 (emphasis added). Accordingly, defendant's conviction should be affirmed if there is sufficient evidence with regard to neglect *or* delinquency; proof related to only one of these potential grounds for court jurisdiction is adequate for conviction.

7

A court may authorize a petition for jurisdiction under MCL 712A.2(b) "upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within the provisions of [MCL 712A.2(b)]." MCL 712A.13a(2). The probable cause standard "requires a quantum of evidence 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief'" that the fact asserted is true. *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003), quoting *People v Justice (After Remand)*, 454 Mich 334, 344; 562 NW2d 652 (1997). Thus, the court takes jurisdiction on the basis of a reasonable belief that a child is subject to neglect at the time jurisdiction is sought. Significantly, this less rigorous standard permits protection of children in emergency situations but by no means automatically leads to the initiation of proceedings to terminate parental rights.

Indeed, an initial exercise of court jurisdiction may result in a wide array of outcomes. For example, the court may permit the child to remain with his parents "under reasonable terms and conditions necessary for either the juvenile's physical health or mental well-being." MCL 712A.13a(3). The court may also "order a parent, guardian, custodian, nonparent adult, or other person residing in a child's home to leave the home and, except as the court orders, not to subsequently return to the home" under some circumstances. MCL 712A.13a(4). Finally, the court may place a child temporarily with relatives or foster care providers. See MCL 712A.13a(8) to (10), (13) and (14). This last option requires that the child be made a temporary court ward. See MCL 712A.19b(1); MCL 712A.19(3). As noted above, temporary court custody is distinct from permanent custody, MCL 712A.20; temporary custody does not entail termination of parental rights

8

but enables parents to regain custody in the future by complying with a service plan designed to "facilitate the child's return to his or her home . . . ." MCL 712A.18f(3)(d); see also MCL 712A.13a(8)(a). Thus, again, it is significant that the threshold for a misdemeanor conviction under MCL 750.145 rests on rendering a child susceptible to the court's jurisdiction "whether or not such child shall in fact be adjudicated a ward" of the court. In other words, MCL 750.145 applies when a child is susceptible even to the very beginning stages of a child protective proceeding, when a court takes jurisdiction for his protection under a probable cause standard, even though he may never be removed from his parents' care.

This discussion highlights the normal threshold necessary for the court to establish jurisdiction over a child. However, important for my analysis here, I reiterate that the prosecution need not establish that there was *actual* jurisdiction over the child or that there was *actual* probable cause for such jurisdiction. The prosecution need only show that defendant's actions were of such a kind or sort that they contributed to or tended to cause the child's susceptibility to the court's jurisdiction.

## C. APPLICATION

Here the police found heroin[6] under defendant's bed and two loaded guns in an unlocked dresser drawer of the bedroom that defendant shared with the child's mother.

---

[6] Heroin is classified in the highest, most harmful category of drugs; it is a schedule 1 substance, MCL 333.7212(1)(b), with a "high potential for abuse" and no safe medical use, MCL 333.7211. Possession of any amount of heroin constitutes a felony. MCL 333.7401(2)(a).

9

As a result of the raid, defendant and the child's mother were arrested. The raid thus revealed that, as a result of defendant's crimes, the child lived in an unsafe home where heroin and loaded weapons were easily accessible to the child. One could certainly entertain a reasonable belief that the accessible guns and extremely dangerous drugs— kept not in a safe or other locked area, but under a bed and in a dresser drawer—posed a significant danger to a 10-year-old child.[7] It would take moments for a child to walk into a bedroom and discover heroin under a bed or open a dresser drawer to discover loaded weapons. I disagree with the majority's assertion that the child's *awareness* of the heroin and weapons is decisive. A jury could conclude that the unsecured heroin and weapons posed a significant danger to the child without regard to whether the child had *yet* discovered these items. I similarly disagree with the majority's assertion that "[e]*verything* the jury knew about this child was in relation to his presence in the home at the moment of the raid; the jury knew these facts and it knew nothing more." To the contrary, the jury learned that both defendant and the child lived in the home. From this fact, the jury was entitled to draw reasonable inferences concerning the child's likely discovery of unsecured, dangerous items.

Accordingly, the evidence of unsecured drugs and two unsecured, loaded weapons was sufficient for a rational jury to conclude that defendant's acts posed a danger to the

---

[7] Because the facts revealed multiple unsecured, loaded weapons within a child's reach combined with similarly accessible heroin, defendant's acts cannot be directly compared to those of a law-abiding gun owner. I address the majority's fears concerning law-abiding gun owners later in this opinion.

10

child that would tend to result in or contribute toward court jurisdiction, particularly under MCL 712A.2(b)(2) which creates jurisdiction over a child "[w]hose home or environment, by reason of *neglect*, cruelty, drunkenness, *criminality*, or depravity on the part of a parent, guardian, *nonparent adult*, or other custodian, is an unfit place for the juvenile to live in."[8] (Emphasis added.) Defendant's decision to keep guns and drugs unsecured and easily accessible in the child's home could also form the basis of a reasonable belief that defendant "neglect[ed] or refuse[d] to provide proper . . . care necessary for [the child's] health or morals," or created "a substantial risk of harm to [the child's] mental well-being" justifying jurisdiction under MCL 712A.2(b)(1).[9]

---

[8] This is to say nothing of the danger posed by defendant's apparent drug-dealing, particularly if he engaged in drug transactions in the child's home. The jury was not asked to decide whether the evidence showed that defendant engaged in drug sales although testimony by police officers at trial established that, during the raid, they confiscated a digital scale and money they believed was attributable to drug dealing. Arguably this evidence could cause a probate court to form a reasonable belief that defendant's drug-dealing posed an additional danger to the child worthy of investigation.

[9] Further, particularly with regard to the child's mental well-being, the evidence shows that the child was scared and crying during the police raid. Defendant's criminal acts were the direct cause of the police raid that traumatized the child. I express no opinion concerning whether a police raid caused by a defendant's criminality could alone justify a conviction under MCL 750.145 as a result of the trauma suffered by a child during the raid, as discussed by the majority. But here defendant's criminality compromised the child's well-being and proper custody in multiple ways that the jury or a probate court could consider in aggregate.

I also note that, if both of the child's caregivers were detained as a result of the police raid, the jury could have reached the alternative conclusion that the child was susceptible to the court's jurisdiction because he was "without proper custody or guardianship." MCL 712A.2(b)(1). Under this criterion for jurisdiction, even if the child was simply temporarily without proper custody because of the arrest of his caretakers, the court could take jurisdiction until the child's return to his mother was appropriate or until

11

In sum, defendant's criminal acts resulted in the presence of dangerous items in the child's home and a traumatic police raid. Because of these combined facts, the evidence was sufficient for a jury to conclude that defendant's acts tended to cause, encouraged, or contributed to neglect—of the child's health or morals, of his mental wellness, *or* by creating an unfit home—to such an extent that a court was likely to find probable cause to believe that there was neglect and thus that the child was susceptible to the court's jurisdiction. Accordingly, the Court of Appeals correctly affirmed defendant's conviction under MCL 750.145. By concluding otherwise, the majority effectively fails to view the evidence in the light most favorable to the prosecution as required by the proper standard of review. The majority focuses on the lack of direct proof that the child was certainly aware of—or already had been directly harmed by—the drugs and weapons. In doing so, it fails to account for the jury's power to draw fair inferences from the evidence in favor of the prosecution's view of the case. Viewed in a light most favorable to the prosecution, a rational jury *could*—and, more importantly, *did*—conclude that the record revealed beyond a reasonable doubt that the child faced trauma (from the police raid) and/or lived among sufficient potential dangers to render him susceptible to probate court jurisdiction for his protection.

---

other arrangements for his care were made. Although a police officer testified that the child's mother was arrested at the scene, the majority correctly observes that the record does not clearly establish whether she was then detained or simply released after the police ticketed her. Accordingly, I concede that the prosecutor's evidence did not show beyond a reasonable doubt that the child was susceptible to the court's jurisdiction for this alternative reason.

12

## IV. ADDITIONAL RESPONSES TO THE MAJORITY

I respectfully suggest that the majority's analysis is underpinned, to some degree, by a misunderstanding of family division jurisdiction and conflation of the potential assertion of jurisdiction with termination of parental rights. As explained above, and contrary to the majority's fears, initial court jurisdiction over a child is not akin to a termination proceeding and by no means must lead to termination of parental rights.

Here, for example, the court could have assumed initial jurisdiction because of the unsafe conditions discovered by the police at the time of the raid. But the court may well have immediately returned the child home conditioned on proof of the removal of all guns and drugs—and, indeed, perhaps on removal of defendant himself—from the home. My point is that the court *still* could have obtained jurisdiction over the child as an initial matter because of defendant's criminal acts even if there were no grounds for termination and the child never became a court ward but was simply returned to his mother.

I further note, in response to the majority's fears, that the low thresholds established by MCL 750.145 are arguably consistent with the nature of the crime. Contributing to the delinquency or neglect of a minor is a misdemeanor, MCL 750.145, and thus is not punishable by a prison sentence, MCL 750.6; MCL 750.7; MCL 750.8.[10]

---

[10] And see *People v Beasley*, 370 Mich 242, 246; 121 NW2d 457 (1963) (A felony in Michigan is distinguishable from a misdemeanor "by reason of the place and severity of punishment."); 1 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1:2, p 9 ("Misdemeanors . . . include all crimes for which punishment is provided that do not amount to felonies, and all acts prohibited by statute where the statute imposes no penalty for the violation.").

13

Indeed, here defendant was sentenced to 45 days' jail time served as a result of this conviction. The majority fears that permitting a conviction in this case would "render a conviction under MCL 750.145 an increasingly routine appendage to a broad array of other criminal charges" in which a defendant has been charged with committing a criminal act in a home in which a child is present and it believes that this is not a result the Legislature intended." But this speculative belief about the Legislature's intent is irrelevant where the text of the statutes is clear. Even if the majority is correct that convictions under MCL 750.145 could be routinely obtained, there would be nothing unconstitutional about such a result and, therefore, we must enforce the statutes as written. Moreover, when a parent actively commits criminal acts within a home inhabited by children, it would be an *entirely rational* thing for the Legislature to be concerned about the welfare of the children.

In any event, I disagree with the majority's assertion that this case involves "a 'by itself' criminal conviction serving as a basis for a neglect or delinquency conviction." To the contrary, as discussed above, defendant's specific acts—keeping unsecured drugs and loaded weapons in the home and necessitating a police raid—were a sufficient basis on which to find probable cause justifying the court's jurisdiction because the acts compromised the child's health, morals, and mental well-being or rendered the home unfit for the child as a result of criminality. Therefore, this case is not comparable to the majority's hypothetical cases in which, for example, a parent *merely* commits tax fraud, performs unlicensed work, or possesses items such as pirated DVDs or "scalped" football tickets in a home where a child is present. First, most of these supposed crimes do not

14

involve keeping inherently dangerous items unsecured in the home. Second, the effect to a child of a parent's unlawful activity cannot be ascertained without the surrounding facts of a particular case. For instance, the majority refers to parents who possess unlawful fireworks. Whether such possession could ever form the basis for a court taking jurisdiction over a child would clearly depend on numerous factors including the dangerousness and location of the fireworks and the age of the child. With regard to the majority's aforementioned fears for lawful gun owners, I express no opinion concerning the circumstances under which a jury could convict a law-abiding gun owner of a misdemeanor under MCL 750.145 because he maintained multiple loaded, accessible guns in a manner that posed significant harm to a child.[11] But, as with the fireworks, the number and the accessibility of the guns as well as the child's age would be significant. Finally, even under the facts of this case, defendant's drug- and weapons-related convictions would not necessarily support a charge under MCL 750.145. For instance, if defendant had been arrested on the street and had kept his guns and drugs outside the home—or, at a minimum, in an area less obviously accessible to young children—the evidence may well have been insufficient to support a conviction under MCL 750.145.

In closing, a conviction under MCL 750.145 is proper if a jury can conclude beyond a reasonable doubt that the defendant's acts tended to cause or contributed toward a child's tendency to come under the court's jurisdiction. A jury's affirmative findings

---

[11] Clearly, mere gun ownership does not endanger children and will not lead to the court taking jurisdiction over a child. Further, *legal* gun ownership may not be said to render a home unfit for a child under MCL 712A.2(b)(2) due, as here, to *criminality*.

on these issues result only in a misdemeanor conviction. These findings do not *cause* court jurisdiction; indeed, the child need not necessarily come under the court's jurisdiction at all. These findings also do not alter the significant protections afforded to parents appearing before the court in child protective proceedings.[12] Although a petition for jurisdiction may be filed in the family division of circuit court as a result of perceived dangers, the court must consider at a preliminary hearing whether jurisdiction is appropriate. MCL 712A.11(1); MCL 712A.13a(2). Perhaps most significant to the majority's concerns, even if the court takes jurisdiction on the basis of a reasonable belief that the child is in danger, the child need not be removed from his home, and by no means must the court initiate proceedings to terminate parental rights. Indeed, the state is generally required to make affirmative efforts to return the child to his parents; termination proceedings generally are a last resort resulting only after parents have been given time to rectify the initial conditions that led to jurisdiction over the child.[13] MCL 712A.19a(2). Further, where the parents are able to immediately remedy the dangers by

---

[12] It is irrelevant that the judge who presided over defendant's criminal trial stated at sentencing that he would contact the Department of Human Services to request that a petition be filed to "terminate" defendant's parental rights. The judge actually—and properly—requested an *investigation* into possible neglect or abuse. Any resulting child protective proceedings against defendant would take place according the mandates and protections of the juvenile code; the criminal judge's mention of "termination" is of no moment.

[13] In 2009, for example, 6,975 child protection petitions alleging abuse or neglect were filed. Only 2,618 termination petitions were filed that year. See Michigan Supreme Court Annual Report 2009, p 45 <http://courts.michigan.gov/scao/resources/publications/statistics/2009/2009execsum.pdf> (accessed May 21, 2010).

16

taking precautions for the child's safety, the child may simply be returned home. See MCL 712A.13a(3) ("[T]he court may release the juvenile in the custody of . . . the juvenile's parents . . . under reasonable terms and conditions necessary for either the juvenile's physical health or mental well-being.")

## V. CONCLUSION

For each of these reasons, I would affirm defendant's misdemeanor conviction for contributing to the neglect or delinquency of a minor under MCL 750.145. A rational jury could—and, most importantly, *did*—conclude that defendant's acts rendered his 10-year-old stepson susceptible to the court's jurisdiction. The majority's decision to the contrary—which I believe is motivated by unjustified fears and a misunderstanding of initial court jurisdiction—is disloyal to the plain text of MCL 750.145, MCL 712A.2(b), and MCL 712A.13a(2).

YOUNG, J., concurred with CORRIGAN, J.

17

# STATE OF MICHIGAN

# SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 137755

GEORGE WALTER TENNYSON,

      Defendant-Appellant.

_____

YOUNG, J. (*dissenting*).

This is really a very simple case. Defendant shared a home with his 10-year-old stepson. In that home, defendant used heroin and stored it on a plate under his bed; he also kept loaded firearms in an unlocked bedroom dresser. These acts precipitated a raid by the police and the arrest of defendant while the child was present.

Only a lawyer could come to the conclusion that defendant's conduct does not constitute "criminality" that, in theory, allows the family division of the circuit court to take jurisdiction over defendant's stepchild. And here we need not even engage in theoretical or fanciful speculation because the trial court did, in fact, recommend to the Department of Human Services that the court exercise jurisdiction over the child. Yet four justices of this Court have held that keeping heroin and illegal, loaded handguns in easily accessible locations in a home occupied by a 10-year-old boy were insufficient predicates for a jury to find defendant guilty of the misdemeanor of contributing to the delinquency or neglect of a minor.

I concur in Justice CORRIGAN's analysis that the evidence in this case is sufficient to sustain defendant's conviction. In particular, I fully support Justice CORRIGAN's straightforward analysis regarding the use of "tend" in the statute: the phrase "tend to cause" is clearly directional and it certainly does not require "but for" causation as the majority opinion holds. I simply cannot subscribe to the majority's herculean effort to create a heightened standard of causation out of a common and well understood term—"tend." The majority notes that the use of "tend" in MCL 750.145 was designed to "*lower[]* the threshold of proof required,"[1] yet the majority inexplicably *raises* the level of causation far beyond what a plain and ordinary understanding of the statute's terms require. I do not believe that the majority's justification for imposing a heightened quantum of proof for a statute that requires the opposite is in keeping with a fidelity to the language contained in the statute.[2]

The majority concludes that it would be "unreasonable" and "potentially absurd"[3] for the Legislature to have created criminal liability on these facts. I do not believe that the legislative protection of children in homes where heroin is used and where loaded guns are easily accessible is either unreasonable or absurd. Simply put, the open use of heroin or being a felon illegally in possession of a firearm is the type of "criminality"

---

[1] *Ante* at 7 (emphasis added).

[2] The causation language of MCL 750.145 provides: "Any person who shall by any act, or by any word, encourage, contribute toward, cause or tend to cause . . . ." It is hard to imagine how the Legislature could have chosen more expansive language of general application to capture conduct injurious to children.

[3] *Ante* at 9.

2

contemplated by the statute, which criminality "tend[s] to cause" a child in its presence to become neglected or delinquent. Accordingly, I dissent.

CORRIGAN, J., concurred with YOUNG, J.

DAVIS, J., did not participate in the decision of this case in order to avoid unnecessary delay to the parties in a case considered by the Court before he assumed office by following the practice of previous justices in transition and participating only in those cases for which his vote would be result-determinative. His nonparticipation in this decision does not affect his eligibility to participate in deciding a motion for rehearing.