*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER JOSEPH BERAK,

        Defendant-Appellant.

UNPUBLISHED
September 2, 2021

No. 352328
Oakland Circuit Court
LC No. 2018-266276-FC

Before: LETICA, P.J., and SERVITTO and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Christopher Berak, appeals as of right his jury trial convictions for first-degree premeditated murder, MCL 750.316(1)(a), and first-degree murder of a peace officer, MCL 750.316(1)(c). The trial court sentenced Berak to life imprisonment without the possibility of parole on both counts. We affirm, but remand for the trial court to correct the judgment of sentence to indicate a single conviction and sentence for first-degree murder under alternate theories.

## I. BASIC FACTS

This case arises from the death of Eric Overall, a deputy with the Oakland County Sheriff's Office, on the morning of November 23, 2017. At the time, Overall was assisting Lapeer County sheriff's deputies in their attempt to stop Berak, who was driving his vehicle. Overall's death was witnessed by numerous officers, captured on video by two dashcam surveillance systems, and Berak was arrested immediately after he struck Overall with his vehicle. Thus, the primary issue before the jury was whether Berak possessed the requisite intent, premeditation, and deliberation to be found guilty of premeditated murder and murder of a peace officer.

## II. DOUBLE JEOPARDY

### A. STANDARD OF REVIEW

Berak argues that his convictions of first-degree premeditated murder and murder of a peace officer violate double jeopardy because only one person was killed. Although the issue was not raised below, Berak and the prosecution both rely on *People v Colon*, 250 Mich App 59, 62; 644

NW2d 790 (2002) for the proposition that because double-jeopardy claims involve a "significant constitutional question," there is no preservation requirement. However, as we explained in *People v Matuszak*, 263 Mich App 42, 47 n 1; 687 NW2d 342 (2004), the *Colon* opinion did not set forth "a complete statement of the more limited standard of review applicable to unpreserved constitutional issues" that was set forth by our Supreme Court in *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999). Thus, "[w]e review for plain error unpreserved claims that a defendant's double jeopardy rights have been violated." *Matuszak*, 263 Mich App at 47; see also *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005) (accord). Under plain-error review, the defendant must show (1) an error occurred, (2) the error is clear or obvious, and (3) the plain error affected the defendant's substantial rights, i.e., it affected the outcome of the lower court proceedings. *Id*. "Reversal is appropriate only if the plain error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*.

## B. ANALYSIS

Berak was charged with and convicted of premediated murder and murder of a peace officer. Both charges and convictions arose from the death of a single victim. As a result, Berak's multiple convictions violate double jeopardy. See *People v Clark*, 243 Mich App 424, 429; 622 NW2d 344 (2000) ("Multiple murder convictions arising from the death of a single victim violate double jeopardy.") and *People v Williams*, 265 Mich App 68, 72; 692 NW2d 722 (2005) (accord). When a defendant is convicted of and sentenced for multiple counts of murder under different theories, "the appropriate remedy to protect defendant's rights against double jeopardy is to modify defendant's judgment of conviction and sentence to specify that defendant's conviction is for one count and one sentence of first-degree murder supported by two theories . . . ." *People v Bigelow*, 229 Mich App 218, 220; 581 NW2d 744 (1998). Therefore, we remand for the trial court to correct Berak's judgment of sentence to reflect a single conviction and sentence for first-degree murder under the alternative theories: premeditated murder and murder of a peace officer.

## III. SUFFICIENCY OF THE EVIDENCE

## A. STANDARD OF REVIEW

Berak argues that there was insufficient evidence to support his conviction of first-degree murder. Because, as explained above, Berak's judgment of sentence must be corrected to reflect that he was convicted of a single count of first-degree murder supported by two theories, we will consider whether there was sufficient evidence to sustain his conviction under both theories. We review de novo a defendant's argument that insufficient evidence was presented to sustain his or her conviction. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). We review the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "Questions regarding the weight of the evidence and credibility of witnesses are for the jury, and this Court must not interfere with that role even when reviewing the sufficiency of the evidence." *People v Carll*, 322 Mich App 690, 696; 915 NW2d 387 (2018). "[C]onflicts in the evidence are resolved in favor of the prosecution." *Id*. Circumstantial evidence and any reasonable inferences that can be drawn from the evidence may be sufficient to prove the elements of a crime. *People v Abraham*, 234 Mich App 640, 656–657; 599 NW2d 736 (1999).

## B. ANALYSIS

The elements of murder of a peace officer are: (1) the defendant committed a murder, (2) the victim was a peace officer, (3) the victim was lawfully engaged in the performance of his or her duties as a peace officer, and (4) that the defendant knew the victim was a peace officer performing lawful duties at the time of the murder. *People v Herndon*, 246 Mich App 371, 385-387; 633 NW2d 376 (2001); MCL 750.316(c). In Michigan, murder "may be first-degree deliberate and premediated murder, second-degree murder, or felony-murder." *Herndon*, 246 Mich App at 386. Thus, relevant to this case, the first element may be proved by evidence that the defendant committed either premediated murder or second-degree murder.

Because premeditated murder is one of the theories of liability that Berak was convicted under, we first consider whether there was sufficient evidence to show that he had the requisite intent for premediated murder. The elements of first-degree premediated murder are "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010); MCL 750.316(a). "[T]o premediate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and the ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look." *Id*. at 242. Further, "[p]remeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *People v Walker*, 330 Mich App 378, 384; 948 NW2d 122 (2019) (quotation marks and citation omitted). "Premeditation cannot be found where a defendant acts on a sudden impulse[,]" but "may be established by circumstantial evidence tending to show that a defendant had an opportunity to think about, evaluate, or take a second look at their actions." *Id*. at 383 (quotation marks and citations omitted). "That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Oros*, 502 Mich at 242. Likewise, "the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing." *Id*. at 243 (quotation marks and citation omitted). "The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Id*.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for the jury to find Berak intentionally killed Overall with deliberation and premeditation, and with the knowledge that Overall was a peace officer performing his lawful duties. Although there is nothing to suggest that Berak had a prior relationship with Overall, there is substantial evidence that he had a prior bad relationship with law enforcement. Other-acts evidence was admitted showing that on two occasions in 2016, he refused to comply with police commands. On the first occasion, he drove approximately one mile before stopping and he spit at the law enforcement officers. On the second occasion, he refused to pull over when signaled and then resisted when the officers attempted to arrest him. Additionally, hours before Overall was killed, a police officer pulled Berak over and ticketed him for speeding. Forty minutes later, Berak made a recording on his phone, proclaiming:

-3-

I am Satan, but I am also God. I am the creator. I am the voice of the creator. I am the voice you hear. The voice you hear is the Creator who created you. And I am here to take back what is mine, so in my laws I state that there will be no more court systems, there will be no more anything. And yes, I can have my phone out if I want in court. If you touch me, I will kill you. This is a message for the court: I will kill anybody in the courtroom who touches me or approaches me in any manner that is aggressive, or if anyone puts their hands on me, I will kill them. I will sen—I will sentence a fireball into their—into their crown and destroy them in front of your face. This was written by Messiah 1-1-2. I will destroy and sentence a fireball into their crown and destroy them. Anyone who steps to me, my son, Christopher Berak, yes, my son's name is Christopher Berak, and yes, I am God, just so you know. I am the voice of God. For I am Christopher Berak, I am the voice of God. Do you understand? Or do you overstand? Because I sentence you into Hell if you take any of these fucking charges that are charged on me for a ticket. If you charge me for a ticket for driving on a street that you paved on my planet, I will fucking kill you. Do you understand? I will fucking kill you if you try to charge me for fucking driving too fast on your fucking road. First of all, I can do whatever the fuck I want. Now, and if—if you try to approach me because I take out my phone, I will kill you, do you understand?

Approximately four minutes later, he made a second recording:

Thirteen, thirteen, this is the thirteenth son. I have a message for Christopher. I will destroy anyone who comes near you. I will destroy anyone in the court who comes near you. If they approach you in an aggressive way, if they do anything to frighten you, if they even come near you, if they touch you, I will kill them with your hands. Do you understand? And I don't care that you see, I'm sick and tired of this shit. Do you understand? Fuck Satan. Okay, Satan works for me. Thirteen love to Satan. Because Satan works for me, I will thirteen love Satan. Do you understand? I will thirteen pain Satan, because Satan is evil. Do you understand? I will thirteen pain Satan. And I will rise up to the thirteenth chakra in this lifetime, because I will, and I guide Chris to nature every day. And he will listen and go to nature because that is what he is destined to do. He is destined to be in nature. And destined means that's where you're supposed to be, that's what was written to be. Destined. It's—it's—it's what was written to happen. It was destined for you to go to nature. It was written for you to go to nature. And you will go to nature, Chris, tonight you will. And we're gonna go to the court and we're gonna destroy them. Do you understand? I—I—I don't—I don't—I don't care that Chris sees us destroying evil, okay? I will destroy them. This is the last straw. This is—this is it. This is it right here. I will destroy them. This is it.

He also sent a text message to a contact saved as "Brett," saying "Don't forget about me bro." Berak's voice recordings suggest the speeding ticket was "the last straw," and that, going forward,

if anyone tried to touch him, ticket him, or approach him in an aggressive manner, he was going to kill and destroy them.[1]

A little over an hour later, Berak appeared outside a correctional facility and indicated he wanted to go inside. While corrections officers were attempting to discuss the matter with him, Berak drove away and went to the adjacent parking lot for Lapeer County Sheriff's Office. When deputies attempted to determine why he was there, he drove away despite commands to stop. Berak lodged expletives at officers multiple times, including yelling that "he was going to light shit up or fire shit up." During the 24-mile pursuit that followed, Berak drove close to the posted speed limit and used his turn signal before changing lanes.

At the intersection of M-15 and Seymour Lake Road, however, Overall was deploying stop sticks. When Berak approached the intersection, Overall was standing directly across the street from his patrol vehicle, in the light from his headlights. There were two vehicles on the south side of the intersection facing Overall with their headlights on. And Berak had his headlights on as well. Although there was sufficient space to both stay in his lane and drive around the stop sticks, Berak suddenly crossed the right fog line, went off the road, and hit Overall while travelling approximately 43 miles per hour. He only braked minimally before steering his vehicle directly toward Overall. Although the defense's expert crash reconstructionist opined that the crash was a reflex action, the prosecution's expert testified that the facts of the case were not consistent with a reflex reaction. Further, although the defense suggested that various light sources, including the emergency lights of the vehicles pursuing Berak may have been blinding him so that he did not see Overall, there is testimony that at least one of the officer's following Berak could clearly see Overall on the side of the road. Yet, conflicts in the evidence are resolved in favor of the prosecution. *Carll*, 322 Mich App at 696. Thus, viewed in the proper light, Berak's actions were not consistent with a reflex, and Overall was visible where he was standing. There was also evidence that after hitting Overall with his vehicle, Berak winked at a police officer. The jury could infer that such an action was meant to taunt the officers.

In sum, taking into account all the circumstances of the killing and viewing them in the light most favorable to the prosecutor, the jury could reasonably infer that hours before encountering Overall on the side of the road, Berak made the decision that he was going to kill any police officer who attempted to interfere with him. That decision was made with both premeditation and deliberation. His appearance at the correctional facility and county sheriff's office allow for an inference that he instigated his interactions with law enforcement to bring about an opportunity to kill. He then led the police on a 24-mile pursuit while maintaining complete control of his vehicle. When he saw Overall, a police deputy, on the side of the road, he made the decision to brake minimally, steer directly toward Overall, and strike him while traveling over 40 miles per hour. At the time, Overall was attempting to stop Berak's vehicle by deploying stop sticks. As Berak stated repeatedly in his voice recordings, he planned on killing anyone who tried

---

[1] In his brief on appeal, Berak suggests that "he was not in his right state of mind" when he hit Overall with his vehicle. However, diminished capacity is not a valid defense to murder. See *People v Carpenter*, 464 Mich 223, 232-241; 627 NW2d 276 (2001).

to approach him in an aggressive manner or who tried to touch him. On this record, there is sufficient evidence to sustain Berak's first-degree murder conviction under both a premediated murder theory and a murder-of-a-peace officer theory.[2]

## IV. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Berak argues that the trial court abused its discretion by admitting evidence of two prior interactions he had with law enforcement. A trial court's decision to admit evidence is reviewed for an abuse of discretion and, as such, "will not be disturbed unless that decision falls outside the range of principled outcomes." *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019) (quotation marks and citation omitted). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id.* at 252 (quotation marks and citation omitted).

### B. ANALYSIS

The admission of "other acts" evidence is governed by MRE 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Thus, "evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). In order for other acts to be admissible under MRE 404(b), the proponent of the evidence must show that the other-acts evidence has a proper purpose other than to show character, the evidence is relevant to an issue of consequence, and the danger of unfair prejudice does not substantially outweigh the probative

---

[2] Even if there were insufficient evidence to support the jury's finding of premeditation and deliberation, there was sufficient evidence to support a finding that when he killed Overall, Berak had the intent necessary to sustain a conviction for second-degree murder. "Second-degree murder is a general intent crime, which mandates proof that the killing was done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm." *Herndon*, 246 Mich App at 386 (quotation marks and citation omitted). Here, viewing the evidence in the light most favorable to the prosecution, the record reflects that Berak formed the intent to kill any law enforcement officer that interfered with him hours before he saw Overall on the side of the road. When he saw Overall, he braked minimally, steered his vehicle directly toward him, and hit him while travelling over 40 miles per hour. The jury could infer that in doing so he intended to kill Overall.

value. *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009). Further, upon request, the trial court must instruct the jury that the other-acts evidence is to be considered only for the proper purpose for which it was admitted. *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

In this case, the prosecution filed a notice of intent to introduce three prior interactions that Berak had with law enforcement. The defense opposed admission of the evidence, and, following a hearing, the trial court determined that two of the three incidents was admissible.

The first incident occurred October 11, 2016. Two officers observed Berak fail to stop at a red light by making a right-hand turn despite a no-turn-on-red sign. He also hit the curb with his vehicle. The officers activated their emergency lights and siren to perform a traffic stop, but Berak continued driving for over a mile before stopping. When an officer approached the window, Berak initially refused a command to put his hands up. Subsequently, he resisted another officer's effort to remove him from his vehicle. When ordered to spit suspected marijuana out of his mouth, Berak unsuccessfully attempted to spit the substance on one officer but successfully spit on the other.

The second incident admitted occurred on December 22, 2016. A police officer was dispatched to a gas station due to a report of a vehicle sitting at a pump for an hour. When the officer arrived, Berak was in his vehicle with the music playing loudly and initially refused to respond to the officer's efforts to speak to him. When instructed to turn down the music and turn off his vehicle, Berak complied with the former instruction but not the latter. He also refused to say why he was at the gas station and ultimately rolled up his window and drove away. The officer followed Berak in his patrol vehicle and signaled him to pull over, but Berak continued until he got to his house. At his house, Berak ran just inside of the front door but was stopped by law enforcement officers. Although Berak resisted the officers' attempts to arrest him by lying on his hands, the officers ultimately succeeded in placing him in handcuffs. Although uncooperative, Berak was not assaultive towards them.

Berak argues that the evidence of the two prior interactions was inadmissible because its only purpose was to present him as a "bad man" who did not respect the police and who engaged in unruly behavior when confronted by them. He contends that there was no proper purpose because someone died in the present matter, but no one was even hurt during the prior incidents. Instead, he argues that the only similarity between the other-acts evidence and the present matter is that he repeatedly refused to comply with police commands. However, the prosecution argued that the evidence was admissible to establish Berak's motive, intent, premeditation, deliberation, and the absence of mistake or accident. Because those are proper purposes under MRE 404(b), we turn to the second prong of the inquiry.

Generally, all relevant evidence is admissible. MRE 402. Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. As noted above, premeditation and deliberation can be established by evidence of the prior relationship of the parties. *Walker*, 330 Mich App at 384. Here, although the record does not show that Berak and Overall had a prior relationship, Berak's recording made clear that he was going to kill any law enforcement officer who touched him, approached him aggressively, or tried to ticket him. Thus, the correct prior relationship was Berak's prior relationship with law enforcement. Thus,

the 2016 incidents had probative value because it showed that there was a prior, hostile relationship between Berak and law enforcement. During the 2016 incidents, he fled the police, refused commands, and resisted arrest. Once, he spit at two law enforcement officers. Those facts have probative force because they put Berak's recording that the speeding ticket he received was the "last straw," and that, going forward, his response to law enforcement was going to be to kill or destroy. Thus, the evidence was highly probative that when he hit Overall he intended to kill him, had a motive to kill him, and that the killing was deliberate and premeditated, rather than an accident.

Finally, probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. See MRE 403. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010) (quotation marks and citation omitted; alteration omitted). Unfair prejudice also "refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611 ; 806 NW2d 371 (2011) (quotation marks and citation omitted). "The prosecution does not have to use the least prejudicial evidence to make out its case." *Id*. Here, the evidence was highly probative of Berak's motive and intent. Furthermore, Berak's defense—that he struck Overall by accident—enhanced the probative value of the evidence. Moreover, the trial court gave a cautionary instruction to the jury both immediately after the testimony was given and during the final instructions. In the instructions, the court explained the limited, permissible use of the evidence, thereby limiting any potential for unfair prejudice. See *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 402 (2014) (noting that a limiting instruction "can help to alleviate any danger of unfair prejudice, given that jurors are presumed to follow their instructions.").

## V. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Berak next argues the prosecution improperly vouched for the credibility of a witness, appealed to the sympathies of the jury, and referred to a fact not in evidence. "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *Bennett*, 290 Mich App at 475. Because Berak did not object to any of the challenged prosecutorial conduct, these issues are unpreserved. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). We will not find error requiring reversal due to unpreserved prosecutorial misconduct when a curative instruction could have alleviated any prejudicial effect. *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

### B. ANALYSIS

A prosecutor's responsibility is to not merely obtain convictions, but to seek justice. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). As a result, "the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Id*. Whether the prosecution committed misconduct is determined on a case-by-case basis after examining the entire record and evaluating the prosecution's conduct in context. *Id*. at 64. A

prosecutor "is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Id*. at 66. However, a "prosecutor may not vouch for the credibility of his witnesses by suggesting that he has some special knowledge of the witnesses' truthfulness." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). In addition, a "prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008).

During his rebuttal closing argument, the prosecutor reminded the jury that one of the witnesses testified that he could see Overall and the object he was handling on the side of the road despite being further away than Berak was as Berak approached Overall. The prosecutor went on:

> [The witness] can still see that the object [Overall] has is hinged, and as you know from Mr. [Roger W.] Barrette, the expert from Chicago, the professor at the preeminent university for crash reconstruction, not only in the United States but perhaps in the world, Mr. Barrette, who has more experience than any accident reconstructionist or crash reconstruction [sic] I submit that you can probably find, he tells you based upon his review and he didn't just, like Mr. [David] Shepardson, drive by the scene one night.

The prosecutor's comments must be evaluated in light of the defense lawyer's arguments. See *Seals*, 285 Mich App at 22. During closing argument, the defense argued that one of the prosecution's experts only received accreditation through the Accreditation Commission on Traffic Accident Reconstruction (ACTAR) after the accident whereas the defense expert had received certification through ACTAR in 1990 and had been doing reconstruction work for "many, many, many years." In light of the defense arguments, the prosecutor's decision, therefore, to highlight the extensive expertise of its second expert witness was not improper vouching.

Berak next argues that the prosecutor improperly made repeated statements designed to appeal to the jury's sympathy for Overall to encourage the jury to decide the case on the basis of emotion rather than facts. The first such statement was during the prosecutor's opening statement, when he noted that Overall was a peace officer and "liked his work. He was one of the—you know, one of the good guys. You know, he was trying to help people and he was a very experienced deputy. He had been on the job many years." The prosecutor also noted that Overall could not be saved after the crash despite "heroic efforts. People made great attempts because all these deputies following behind were right there, and you'll hear from some of the deputies how they saw Deputy Overall on the side of the road. They saw him standing there and they saw the Defendant strike him." Then, while questioning Overall's son, the prosecutor asked him to "briefly describe your father to the ladies and gentlemen of the jury." In response, Overall's son testified:

> Easily the best man I've ever met, and I know a lot of other people agree. Always wanted to help people, wanted nothing but to make people happy and be there for people in their time of need. He wanted to be a friend. He wanted to be just the person people would go to whenever they had a problem and wanted to solve it, or just needed someone to talk to, or just be a friend.

Finally, during his closing argument, the prosecutor referred to various witnesses as "a very nice officer," "a nice gentleman, a hard[-]working man," and "a very nice man" who just enlisted in the Marines to serve our country.

The prosecutor's references to Overall's character in his opening statement and his open-ended question to Overall's son that was clearly intended to invoke character evidence were improper. The prosecutor bore the burden of proving Overall was a peace officer, was deceased, and that his death was the result of Berak's actions. Thus, Overall's character was irrelevant to any issue before the jury, and the prosecutor's injection of such served no purpose other than to improperly invoke the sympathy of the jury for the victim. See *Unger*, 278 Mich App at 237. Moreover, there was no compelling reason for the prosecutor to have called Overall's son as a witness. The son's testimony, even without the references to his father's character, was very moving. He described hearing that an officer had been injured in the area where his father was working, being unable to reach his father on the telephone, and ultimately seeing his body at the hospital and knowing, based on the extent of the injuries, that he was dead. Testimony identifying Overall as the peace officer who was killed could have been presented by any of the officers present at the murder scene. That the prosecutor chose to call Overall's son for this relatively simple testimony and then elicited irrelevant character evidence strongly suggests the prosecutor strategically and improperly sought to invoke the jury's sympathy. In doing so, the prosecutor engaged in prosecutorial misconduct.

Nevertheless, this testimony and the prosecutor's scattered references to Overall's character were fairly brief. Berak's trial was held over a 10-day period and involved 33 witnesses. The evidence against Berak was compelling. As detailed more fully above, Berak considered a speeding ticket to be the "last straw" and he repeatedly vocalized his intent to kill anyone who tried to touch him, approach him in an aggressive manner, or ticket him. He then went in search of law enforcement officers, stopping at a correctional facility and the parking lot of the local sheriff's office. Then after driving 24-miles while being pursued by law enforcement and while maintaining control over his vehicle, he came to an intersection where stop sticks were being deployed. Overall was standing on the side of the road in the light from the headlights of his own vehicle. Berak braked minimally and then turned his vehicle to cross the fog line and strike Overall with his vehicle while he was going over 40 miles per hour. Thus, in context, the prosecutor's relatively brief and improper references to Overall's good character and to the good character of other witnesses, did not affect the outcome of the proceedings. Moreover, a timely objection would have not only allowed the trial court to give a contemporaneous curative instruction telling the jury to disregard the improper comments, but it would have likely also prevented or limited additional comments regarding the good character of Overall and of various witnesses for the prosecution. Thus, although the prosecutor's statements were improper, reversal is not warranted.

Finally, during his closing argument, the prosecutor reminded the jury that Berak stopped on I-69 when a police deputy signaled him to do so, but then drove away before the stop was completed. The prosecutor noted that as Berak began pulling away, the deputy hit his window with his flashlight, but was unsuccessful in breaking the glass. The prosecutor then said, "Ladies and gentlemen, that would further anger the Defendant in addition to his other building hostility that you had heard from him earlier." Berak argues there was no evidence in the record to support the prosecutor's assertion that hitting his window with a flashlight would anger him. However, Berak's voice recordings clearly express a deep-seated anger toward law enforcement interfering

with him, including giving him tickets, touching him, and approaching him in a hostile manner. Based on that, it was reasonable to infer that an officer striking the glass on his vehicle while attempting to make him comply with a traffic stop would, in fact, anger Berak. Thus, the prosecutor's argument is supported by the record.

Berak lastly argues that, even if none of the above claimed errors individually deprived him of a fair trial, the cumulative effect of such errors did. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. Reversal may be warranted where several minor errors occurred, even though none of them would be sufficient standing alone, but those errors must nevertheless have had some prejudicial effect. *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). Here, the only error was the prosecutor's references to Overall's good character and to the good character of other witnesses. Although there were repeated instances of this, all of them were fairly minor instances of prosecutorial misconduct, and they did not deny Berak a fair trial.

Affirmed, but remanded for the trial court to correct the judgment of sentence to reflect a single first-degree murder conviction supported by alternate theories of premeditated murder and murder of a peace officer. We do not retain jurisdiction.

/s/ Deborah A. Servitto
/s/ Michael J. Kelly