*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

GREGORY ALLEN RINGEL,

      Defendant-Appellant.

UNPUBLISHED
June 10, 2026
1:19 PM

No. 371588
St. Clair Circuit Court
LC No. 22-001469-FC

Before: BAZZI, P.J., and RICK and MALDONADO, JJ.

PER CURIAM.

This case arises out of defendant, Gregory Ringel, firing a shotgun at his wife, DR; taking steps to conceal his involvement; and falsely reporting an intruder in their home. Defendant appeals as of right his jury conviction of assault with intent to murder, MCL 750.83, arguing that there was insufficient evidence to support his conviction.[1] Further, defendant argues that at sentencing the trial court erred by scoring OV 6 at 50 points for premeditation and that his sentence of 15 to 30 years' imprisonment for the assault with intent to murder conviction was disproportionate and unreasonable. We affirm.

## I. BACKGROUND

At approximately 3:00 a.m. on March 29, 2022, the St. Clair County Sheriff's Office received a 911 call reporting a home invasion with shots fired at defendant's home. When officers arrived, defendant claimed that he had been awakened by the sound of a gunshot. After he heard the gunshot, defendant retrieved a pistol from the bedside table. When he exited his bedroom, defendant claimed that he saw a shadow coming from the direction of the room where DR was

---

[1] Defendant was also convicted of discharge of a firearm in or at a building, MCL 750.234b; two counts of carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm), MCL 750.227b; false report of a felony, MCL 750.411a(1)(b); and tampering with evidence, MCL 750.483a(6)(b). On appeal, defendant challenges only his conviction for assault with intent to murder.

sleeping, and he fired his pistol at it. Defendant stated that the shadowy figure moved through the kitchen and exited the home through the mudroom into the garage.

DR had also been awakened by a noise in the home, a heavy metal cup hitting the floor in the kitchen. When she heard a second noise, DR got out of bed to see what was going on. As she opened the door to her bedroom, someone fired a shotgun toward the door. The shot was close enough to her that later that day DR developed "a rash from [her] ear down across [her] neck" and to her collarbone." DR quickly attempted to shut the door, putting her entire bodyweight against it and sitting on the floor. Before she could close the door, the person jammed the barrel of the gun between the door and the door frame. DR pushed so hard against the door that there was a concave, half-moon impression on the door and the doorframe itself. A few seconds later, the gun disappeared, and she was able to shut the door. DR heard another gunshot and assumed that defendant was shooting at the intruder. Defendant then came to the door and asked if she was all right. At some point, defendant also called her to see if she was okay and stated that he was going to call 911. Defendant later testified that he had accidentally called DR when he tried to call 911.

Upon investigation, law enforcement did not find any evidence of an intruder in the home. But a search of defendant's phone revealed he had a romantic relationship with his longtime friend from work and had lied to detectives about the nature of their relationship. A search warrant for defendant's home was then drafted. Before law enforcement executed the search warrant, detectives went to speak with defendant at the home. Defendant admitted that he fired the shotgun but denied having a plan or an intent to kill DR. Defendant stated that he was in a fog when he grabbed the shotgun and loaded it with a buckshot round from his dresser drawer. Defendant told the detectives that after he fired the shotgun, the fog went away. Defendant explained that he realized what he had done and felt that he would need to cover up what happened. Defendant took the pistol from his bedroom and fired a shot through the wall into the bathroom. He then hid the shotgun in the corner of the garage behind a cabinet. Defendant admitted that there was no intruder and that he had called 911 and falsely reported a home invasion. Defendant claimed that after the incident, he cut up the shotgun into pieces and disposed of the shotgun. However, the shotgun believed to have been used in the assault was later found in defendant's home.

At trial, defendant testified that, just before the incident, he started having pain, redness, and swelling in his arm and was prescribed several medications, including steroids. Defendant testified that he experienced side effects from the medications, such as having lucid dreams about being with his father, who had passed away several years before. On the night of the incident, defendant dreamed about hunting pheasants with his father. When testifying about what he remembered that night, defendant stated that there were "gaps" in his memory, and at the time of trial, he still did not recall everything from that night. Defendant testified that he did not remember grabbing the shotgun, loading it, or walking down the hallway toward DR's room. When asked if he remembered the shotgun blast, defendant responded that he had "seen a pheasant take off and [he] shot at it." He did not remember going back to the bedroom with the shotgun, but recalled his father saying, "hey, come on, let's go, we got to go home and do some chores." When asked about the barrel of the gun being wedged in the door, defendant responded that he remembered it being stuck but thought that he was in a field, and the gun was stuck on the limb of a tree.

Dr. Gerald Shiener, who specialized in psychiatry, was hired as an expert witness by defendant. Dr. Shiener diagnosed defendant as having experienced a steroid-induced psychotic

episode that night. He testified that it was "noteworthy" that in February 2022 defendant was prescribed an "aggressive dose of the corticosteroids" that was maintained "at a relatively high dose." Dr. Shiener testified that a common side effect of steroids is psychosis, which he described as manifesting in different ways for different people, often perceptual distortions of what a person sees or illogical thinking. He testified that a person experiencing psychosis typically would not be "aware that something is wrong" and be convinced that they are "acting logically and rationally." Further, someone who experiences psychosis may remember the event but fail to differentiate between what is real and what is not.

At the conclusion of trial, defendant was convicted and sentenced, as stated earlier. Defendant now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant argues that there was insufficient evidence for the jury to find beyond a reasonable doubt that he had the required intent to murder. We disagree.

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Qang*, 505 Mich 239, 251; 952 NW2d 334 (2020). However, "[t]he standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

"In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020). There is sufficient evidence to support a conviction when "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotation marks and citation omitted). "The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532; 917 NW2d 752 (2018) (quotation marks and citation omitted).

On appeal, defendant only challenges his conviction for assault with intent to murder. "To prove assault with intent to murder, the prosecution must show (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (quotation marks and citation omitted). "Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent." *People v Stevens*, 306 Mich App 620, 629; 858

NW2d 98 (2014). "Intent to kill may be inferred from all the facts in evidence, including use of a deadly weapon, taking aim at a victim, injury to the victim, evidence of flight and attempts to hide evidence." *People v Everett*, 318 Mich App 511, 531 n 10; 899 NW2d 94 (2017) (quotation marks and citation omitted).

We conclude that the jury was presented with more than sufficient evidence from which it could be inferred that defendant had the intent to kill DR. Although defendant argues that he never expressed a plan to kill DR, such explicit statements are not necessary because minimal circumstantial evidence is sufficient to prove intent. See *Stevens*, 306 Mich App at 629. In this case, the circumstances of the assault and defendant's actions after the fact supported an inference of intent to kill.

First and foremost, an intent to kill can be inferred by defendant's use of a deadly weapon. See *Everett*, 318 Mich App at 531 n 10 (quotation marks and citation omitted). Although the majority of his firearms were kept in the gun safe, defendant kept a single-barrel shotgun in his bedroom closet and one shotgun shell in the drawer of the dresser in his bedroom. Defendant grabbed the shotgun, loaded it, and proceeded toward DR's room. Defendant knew that DR was staying in the guest bedroom and fired the shotgun as she opened the door. The trajectory of the shot was toward the center mass of the average person, and the buckshot fired from the shotgun was more than capable of killing. Further, after firing the shotgun, defendant continued to advance and jammed the barrel of the gun between the door and doorframe. Defendant argues that Detective Schwartzkopf testified that he could not know how defendant was holding the gun or what his intent was, but the uncertainty about how defendant was holding the shotgun is outweighed by the fact that defendant had grabbed the shotgun from the closet, loaded it, and purposefully walked down the hallway to DR's room.

Moreover, defendant's extensive lies and attempts to hide what happened support an inference that he had the intent to kill. See *id*. After shooting at DR, defendant immediately began what he himself described as a "cover-up." Before law enforcement arrived at the home, he collected the shotgun shell and hid the shotgun used in the assault. He fired his pistol into the bathroom wall to make it appear that he had fired at an intruder and falsely reported a home invasion. He repeated this lie to law enforcement, his wife, and friends, even telling law enforcement that he had seen a vehicle flee the scene. Defendant only began to admit his involvement after he was confronted by detectives about the lack of evidence of an intruder, having an affair, and detectives' suspicions that he had fired the shotgun. Even after admitting to having fired the shotgun, defendant also lied to detectives about having cut up and disposed of it.

In finding defendant guilty of assault with intent to murder, the jury weighed the evidence before it and made credibility determinations and "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). The jury had the opportunity to assess defendant's credibility and found his testimony that he did not have a plan to kill DR not credible. This assessment of defendant's credibility was more than reasonable given the disparity between defendant's story immediately after the incident and at trial. Defendant's story about what happened changed several times throughout the investigation: from claiming there was an intruder, to admitting he fired the shotgun and had tried to cover it up, to testifying that he had been dreaming about hunting when he fired the shotgun at DR. After hearing defendant's testimony

and the expert opinion of Dr. Shiener, that defendant had experienced a steroid-induced psychotic episode, the jury nonetheless found that defendant had intended to kill DR when he fired the shotgun. Defendant's claim that he experienced a psychotic episode was undermined by the fact that he appeared coherent when speaking to law enforcement immediately after the shooting and that he had not expressed to his doctors, wife, or the woman he was having an affair with that he was experiencing side effects to his medication.

Accordingly, given the evidence presented and the deference we give to the jury's weighing of the evidence and credibility determinations, there was more than sufficient evidence to infer that defendant had the intent to kill.

### III. OV 6

Defendant argues that the trial court erred by assessing 50 points for OV 6 because the record did not support a finding that defendant had premeditated intent to kill. We conclude that defendant waived his scoring challenge by expressing approval of the presentence investigation report (PSIR) at sentencing.

"To preserve a challenge to the scoring of the sentencing guidelines, the challenge must be raised at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in this Court." *People v Ventour*, 349 Mich App 417, 433; 27 NW3d 660 (2023); see MCR 6.429(C). Defendant did not raise any scoring issues in the trial court or through a motion to remand in this Court; therefore, this issue is not preserved for appeal. See *id*. Further, waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). At sentencing, the trial court asked defendant if he had reviewed the PSIR, which included his sentencing guidelines, and whether he found the report "factually accurate and relevant." Defendant responded that he was "not challenging the accuracy of the report." Accordingly, defendant has waived the scoring issue he raises on appeal. See *id*.

### IV. PROPORTIONALITY

Defendant also argues that his sentence was not proportionate to the circumstances surrounding the offense and the offender, and therefore, was unreasonable. We disagree.

"[D]efendants may challenge the proportionality of any sentence on appeal and that sentence is to be reviewed for reasonableness." *People v Posey*, 512 Mich 317, 360; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). A within-guidelines sentence carries a rebuttable presumption of proportionality. *Id*. "[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate . . . ." *Id*. at 359. "A defendant may overcome the presumptive proportionality of a within-guidelines sentence by 'present[ing] unusual circumstances that would render the presumptively proportionate sentence disproportionate.' " *Ventour*, 349 Mich App at 430, citing *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013).

The minimum sentencing guidelines range for defendant's assault with intent to murder conviction was 135 to 225 months. The trial court sentenced defendant to a minimum term of 180 months or 15 years, at the middle of the guidelines range. Nonetheless, defendant argues that he is entitled to reconsideration because the sentencing guidelines do not adequately address mitigating circumstances in defendant's background, such as his military service and diagnosis of post-traumatic stress disorder.

Defendant's within-guidelines sentence is presumptively proportionate, and defendant has presented no unusual circumstances to overcome that presumption. See *Ventour*, 349 Mich App at 430. Moreover, defendant's claim that the trial court did not consider mitigating circumstances is without merit. It is well settled that "trial courts are not required to expressly or explicitly consider mitigating factors at sentencing." *People v Barnes*, 332 Mich App 494, 507; 957 NW2d 62 (2020) (quotation marks and citation omitted). And, the trial court had the opportunity to consider the mitigating circumstances defendant identifies on appeal. Before sentencing, the trial court reviewed the PSIR, which contained the information about defendant's military service and mental health. At sentencing, defense counsel also highlighted defendant's long military service, his role in raising a family, and the lack of any history of violence. Accordingly, it cannot be said that the trial court did not have this information at sentencing and there is no indication that the trial court did not consider it. Contrary to defendant's arguments, defendant's background and lack of criminal history were also accounted for in the sentencing guidelines by defendant's low prior record variables score.

The minimum sentence at the middle of the guidelines was reasonable and proportionate when weighing defendant's background against the severity of the crime. Defendant was convicted of assault with intent to murder; and, as the trial court noted at sentencing, it appears to be only luck that DR survived defendant firing a shotgun at her. Therefore, the trial court did not abuse its discretion.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado